George C. WILLIAMS, et al., Plaintiffs, Appellants,

v.

Richard E. POULOS, et al., Defendants, Appellees.

George C. WILLIAMS, et al., Plaintiffs, Appellees,

v.

Richard E. POULOS, et al., Defendants, Appellees,

Ralph A. Dyer, Intervenor, Appellant.

George C. WILLIAMS, et al., Plaintiffs, Appellees,

v.

Richard E. POULOS, et al., Defendants, Appellees,

Rodney P. Rodrigue, Defendants, Appellants.

George C. WILLIAMS, et al., Plaintiffs, Appellees,

v.

Richard E. POULOS, et al., Defendants, Appellants.

Nos. 93–1366 – 93–1368, 93–1680.

United States Court of Appeals, First Circuit.

Heard Aug. 4, 1993.

Decided Dec. 14, 1993.

**273**

Allen S. Rugg, with whom Ronald R. Massumi, Kutak, Rock & Campbell, Washington, DC, John S. Whitman, Richardson & Troubh, Portland, ME, were on brief, for plaintiffs-appellants George C. Williams, Allied Capital Corp., Allied Inv. Corp., Allied Venture Partnership, Allied Capital Corp. II, David P. Parker, David Gladstone, Brooks H. Browne, Frederick L. Russell, Jr., and Thomas R. Salley, E. Stephen Murray, with whom Murray, Plumb & Murray, Portland, ME, were on brief, for intervenor-appellant Ralph A. Dyer.

John A. McArdle, III, with whom Daniel G. Lilley and Daniel G. Lilley Law Offices, P.A., Portland, ME, were on brief, for defendants/appellees/cross-appellants Rodney P. Rodrique, Wayne E. Bowers, Sr. and John Robichaud.

Peter J. DeTroy, III, with whom Norman, Hanson & DeTroy, Portland, ME, were on brief, for defendants/appellees/cross-appellants Richard E. Poulos, John S. Campbell and Poulos & Campbell, P.A.

Before SELYA and STAHL, Circuit Judges, and FUSTE,* District Judge.

STAHL, Circuit Judge.

Following a six-day civil bench trial, the district court ruled that the former principal

* Of the District of Puerto Rico, sitting by designation.

owners of Consolidated Auto Recyclers, Inc. ("CAR"), defendants Wayne Bowers, Rodney Rodrigue, and John Robichaud (hereinafter "the CAR defendants"), violated the federal and Maine anti-wiretap statutes when they intercepted and recorded telephone calls made by and to plaintiffs, who were employees or former employees of Allied Capital Corporation ("Allied") and certain of its subsidiaries and affiliates.[1] *See* 18 U.S.C. § 2511(1)(a) and 15 M.R.S.A. § 710(1).[2] The court also held that counsel retained by the CAR defendants, defendants Richard E. Poulos and the law firm of Poulos, Campbell & Zendzian, P.A. (hereinafter "the Poulos defendants"), violated 18 U.S.C. § 2511(1)(c) and (d) and 15 M.R.S.A. § 710(3)(A) and (B) when they disclosed and used the recordings of the telephone calls at issue with the requisite *mens rea*.[3] As a result, the court enjoined all defendants "from further using and disclosing information contained in the sub-ject interceptions except to obtain rulings regarding admissibility in [an] underlying suit [brought by the CAR defendants against plaintiffs]."[4] *See* 18 U.S.C. § 2520.[5]

Each of the three sides to this controversy has appealed from various rulings made by the district court. Both the CAR defendants and the Poulos defendants challenge sundry factual findings and legal judgments, arguing essentially that their respective actions did not run afoul of Title III and the Maine anti-wiretap statute. Plaintiffs' primary claim is that the court's injunction does not sufficiently remedy the harm they have suffered and are continuing to suffer. After carefully reviewing the record and the parties' arguments, we affirm the judgment below.

## I.

### BACKGROUND

The following detailed recitation is derived from the factual findings made by the district

---

1. For simplicity's sake, the term "Allied" should be construed as encompassing all corporate and individual plaintiffs, including intervenor Ralph A. Dyer.

2. 18 U.S.C. § 2511(1)(a) is a provision of the federal anti-wiretap statute, found at Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521. In conjunction with other statutory provisions, it creates criminal and civil liability for any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication."

 15 M.R.S.A. § 710(1) is a provision of the Maine anti-wiretap statute, found at 15 M.R.S.A. §§ 709–713. In conjunction with other statutory provisions, it creates criminal and civil liability for any person who "intentionally or knowingly intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire or oral communication."

3. 18 U.S.C. § 2511(1)(c) and (d), in conjunction with other statutory provisions, create criminal and civil liability for any person who

 (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection; or
 (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the

interception of a wire, oral, or electronic communication in violation of this subsection....

 15 M.R.S.A. § 710(3)(A) and (B), in conjunction with other statutory provisions, create criminal and civil liability for any person who

 A. Intentionally or knowingly discloses to any person the contents of any wire communication, knowing that the information was obtained through interception; or
 B. Intentionally or knowingly uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception.

4. In the underlying suit, *Bowers v. Allied Capital Corp.*, Civ. No. 91–0021–B (D.Me. filed January 1991) (Brody, J.) ("*Bowers*"), which was stayed pending resolution of the instant case, the CAR defendants assert causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk, and a host of common law theories. Essentially, they contend that Allied entities and personnel brought about the demise of CAR through certain acts primarily committed in the summer of 1990. The particulars of the relationship between CAR and the Allied entities and personnel will be discussed more fully *infra*.

5. *Inter alia*, 18 U.S.C. § 2520 authorizes persons victimized by violations of 18 U.S.C. § 2511(1)(a), (c), and (d) to recover, by means of a civil action, (1) appropriate equitable or declaratory relief; (2) actual or statutory damages; (3) punitive damages; and (4) litigation costs and a reasonable attorney's fee.

court in conjunction with Allied's motion for preliminary injunctive relief, *see Williams v. Poulos,* 801 F.Supp. 867, 868–72 (D.Me.1992) (*"Poulos I"*), and after the conclusion of the bench trial. *See Williams v. Poulos,* Civ. No. 92–0069–B, slip op. at 3–10 (D.Me. February 4, 1993) (*"Poulos II "*).[6]

This case is but one in a series of civil lawsuits and bankruptcy proceedings which can be traced to the collapse of CAR. CAR was founded in 1988 in order to dismantle automobiles and resell used parts. By May 1990, CAR employed approximately one hundred and forty people and operated throughout New England and in the Atlantic provinces of Canada. Twenty people worked in CAR's East Vassalboro, Maine, headquarters, including Bowers, Rodrigue, and Robichaud, the CAR defendants. These three owned 95% of CAR's stock and were members of CAR's Board of Directors ("the Board"). In addition, Bowers was CAR's Chief Executive Officer ("CEO") and Treasurer, while Rodrigue served as CAR's President.

To finance its early growth and operations, CAR developed a banking relationship with Casco Northern Bank. In February 1990, Casco Northern refused to increase CAR's lines of credit. As a result, CAR found itself in a serious financial bind because it had already spent the additional money it expected to receive. Accordingly, CAR turned to Allied, a venture capital firm which had previously invested in it. Allied responded with a large infusion of capital that raised its total investment in CAR to approximately $4,500,-000.

Despite this additional funding, CAR was unable to resolve its financial difficulties. On May 29, 1990, Casco Northern declared CAR in default on its obligations. Two days later, Allied followed suit. On June 28, 1990, in an attempt to resolve the crisis, the CAR defendants entered into an agreement with Allied which came to be known as the "Midnight Agreement." Under its terms, Ralph A. Dyer was made CAR's CEO and Chairman of the Board, three representatives of Allied, plaintiffs George C. Williams, David Gladstone, and Frederick Russell, Jr., became members of the Board, and David Parker became an officer. The Agreement also provided that the CAR defendants would remain on the Board, that Bowers would retain his position as Treasurer, and that Rodrigue would continue as President.

Meanwhile, in May 1990, the CAR defendants had commissioned Michael Leighton, who owned Probe Investigating Service, Inc. ("Probe"), to provide a system for electronically monitoring employee phone calls.[7] The CAR defendants felt that a surveillance system was needed (1) to reduce CAR's telephone bills, and (2) decrease employee theft. At the time they installed the system, the CAR defendants apparently received impromptu advice from Attorney Nicholas Lanzilotta that "monitoring would not be illegal if notice was first given to the monitored employees."

After examining CAR's telephone system, Leighton concluded that he lacked the skill and expertise to create an appropriate monitoring system. He therefore sought assistance from Jonathan Broome. Broome's principal business was repairing consumer electronics; he was not an authorized telephone system technician. Although Broome considered the project to be unusual, Leighton assured him of its legality.

On or about June 17, 1990, Broome, working after hours along with CAR security officer David Fisher, installed a custom-designed monitoring system[8] in CAR's East Vassalboro headquarters. In its findings of fact, the district court described the system as follows:

---

6. The order and memorandum of opinion on the bench trial incorporates by reference the factual findings set forth in the order and memorandum of opinion on the motion for a preliminary injunction. *See Poulos II,* slip op. at 3.

7. Leighton and Probe were also named as defendants in this action. At the close of trial, the district court granted their oral motions for judg-

ment as a matter of law. Plaintiffs have not appealed these rulings.

8. Apparently, there was no commercially available system which could perform the intercepting and recording functions desired by the CAR defendants.

The system ... consisted of small alligator clips attached to a microphone cable at one end and a "punch-down" at the other. The wires to all the extension lines in CAR's offices were assembled on the punch-down. Calls could be intercepted by attaching the alligator clips and microphone wire to a designated extension line on the punch-down. The system could only monitor one extension at a time.

The monitoring system designed by Broome also involved an interface connecting the microphone cable to a VCR and a video camera. The VCR allowed the system to record calls for up to eight hours. The video camera recorded the view meter on the VCR, allowing a person to fast forward the VCR tape until the meter indicated the presence of audio information. The VCR, video camera and interface were mounted together on a plywood board and set up in an unused bathroom next to the area containing the punch-down. Connecting wires were run through and over a suspended ceiling.

*Poulos II,* slip op. at 4–5.

At some point in June 1990, Rodrigue informed the managers at CAR that all telephone calls at CAR's offices would be subject to random monitoring and recording. He also instructed the managers to inform their subordinates of the new monitoring policy. At about the same time, Rodrigue directed employees to record long distance phone calls on provided telephone logs. The employees were told that the logging system was to be used in conjunction with the monitoring system to reduce costs. On June 29, 1990, Rodrigue told the new CEO, Dyer, that CAR had a system in place to deter employee phone abuse by randomly monitoring employee phone calls.

David Fisher learned how to operate the monitoring system. At first, he was instructed by the CAR defendants to monitor the extension lines randomly. After a short time, however, the CAR defendants told him which lines to intercept. Fisher was further instructed to deliver the tapes of recorded conversations to Wayne Bowers each day. Bowers then made cassette tapes of those telephone conversations he wished to save.

On June 21, 1990, Fisher was instructed to monitor the telephone line of CAR Chief Financial Officer Richard Lee, who had been hired on Allied's recommendation. Apparently, Rodrigue and Bowers doubted Lee's loyalty to CAR. A few weeks later, however, the monitoring system was attached to the phone line of Jim Starr, an accountant from an outside firm who had been assigned to audit CAR. The CAR defendants suspected that Starr was misusing the telephone system.

During this same general time period, Dyer's relationship with the CAR defendants, which had been strained from the beginning, was rapidly deteriorating. By July 10, 1990, Rodrigue and Robichaud were openly feuding with him. On July 12, 1990, Dyer fired Rodrigue and Robichaud. About a week after the firing, Dyer obtained a temporary restraining order barring Rodrigue and Robichaud from the CAR premises and prohibiting them from conducting any business on the company's behalf. Meanwhile, on July 17 or 18, 1990, Dyer began occupying Starr's office and using Starr's telephone line. Between July 18, 1990, and July 25, 1990, a number of Dyer's telephone calls were intercepted and recorded. The CAR defendants admit that, by July 19, 1990, they were specifically targeting Dyer's conversations.[9]

On July 21, 1990, the CAR defendants met with attorneys Richard E. Poulos, John S. Campbell, and Paul F. Zendzian, the partners of Poulos, Campbell & Zendzian, P.A., to discuss possible legal representation in matters involving CAR, Allied, and Dyer.[10]

---

9. Although not mentioned in the district court's findings of fact, the record reflects that telephone conversations involving Brooks Browne, an Allied employee working at CAR in late July 1990, also were intercepted and recorded. These conversations took place while Browne was using Dyer's telephone.

10. Zendzian was not named as a defendant in this action. Campbell, who was a defendant below, was adjudged by the trial court not to have violated either Title III or the Maine anti-wiretap statute. Plaintiffs have not appealed from this ruling.

At that meeting, the existence of a tape containing recorded telephone conversations between Dyer and Allied employees and representatives was disclosed to the Poulos defendants. The Poulos defendants made no inquiry into either how the tape was obtained or whether there was employee notice or consent. They did, however, advise the CAR defendants to boycott a Board meeting that was scheduled for July 23, 1990. That meeting, which was held telephonically so that the out-of-town Allied employees could participate, was taped by the CAR defendants.

All monitoring and taping of telephone conversations at CAR's headquarters was discontinued on July 25, 1990. On that same date, audio cassettes of some of the conversations that had been taped were delivered to the Poulos defendants, who soon thereafter agreed to represent the CAR defendants in the *Bowers* lawsuit. *See supra* note 4. Over the following six weeks, paralegals from the Poulos firm prepared transcripts of the tapes.

On July 27, 1990, pursuant to a certificate filed by Dyer with the United States Bankruptcy Court, a Chapter 11 bankruptcy proceeding was initiated on behalf of CAR. Anthony Swenson was appointed Chapter 11 trustee for CAR on August 10, 1990. On August 14, 1990, Swenson fired Dyer and rehired Bowers, Rodrigue, and Robichaud. Subsequently, the bankruptcy proceeding was converted to Chapter 7.

In early August 1990, Poulos asked Stuart W. Tisdale, an associate attorney in his office, to prepare a memorandum concerning the legality of intercepting wire communications. In discussing the research assignment with Tisdale, Poulos stated that Dyer knew about the taping in question. After reading Tisdale's memorandum, Poulos and Campbell were satisfied that at least some of the information from the tapes might be admissible as evidence or would be otherwise useful in the case against Allied. In the district court's view, however, they did not "follow through on their research on the issue of consent and the legality of the interceptions." *Poulos II,* slip op. at 8. Nor did they "make an effort to determine directly whether Dyer and the other Allied employees whose conversations were intercepted knew of or consented to the monitoring." *Id.* Finally, the Poulos defendants "did not consult with bar counsel or advise any court of the existence and use of the information derived from the telephone conversations." *Id.*

On September 3 and 4, 1990, Poulos read the transcripts of most of the recorded conversations that had been preserved. On October 31, 1990, he disclosed contents of the tapes to Daniel Amory and David Crocker, counsel to the CAR Chapter 11 trustee. In so doing, Poulos told Amory and Crocker that the tapes he possessed might have been criminally obtained. He also asked them to keep the existence and contents of the tapes strictly confidential. In November and December of 1990, Poulos again reviewed the tapes.

In September, October, and early November of 1990, the Poulos defendants obtained a large number of documents previously delivered by Allied to CAR's Chapter 11 trustee. The documents were produced without any involvement of the Poulos defendants and without any connection to the existence of the taped telephone conversations. These documents included notes, memoranda, and other written records of telephone conversations that had been taped on July 18, 19, 20, and 23, 1990.

In January 1991, the CAR defendants filed the *Bowers* lawsuit, seeking $63,000,000 in damages from Allied, Dyer, and Leo Madden, a business associate of Dyer's. After the complaint was filed, all discovery was stayed until December 5, 1991. During January 1992, shortly after the discovery stay was lifted, Poulos took the depositions of Williams, Parker, Dyer, and Madden. Poulos used both the discovery documents pertaining to the taped conversations and the tapes of the conversations themselves in preparing for the aforementioned depositions. Following these depositions, Poulos revealed the existence of the tapes to counsel for Madden and Dyer. In so doing, he (1) told counsel that the tapes proved that Madden and Dyer had lied during their depositions, and (2) offered to settle with them. No settlement was reached between the parties,

278

and the present lawsuit was filed by Allied on April 17, 1992.

## II.

### STANDARD OF REVIEW

■ Insofar as the parties are challenging determinations made by the district court prior to and in conjunction with the bench trial, our standard of review is familiar. Claimed errors of law are, of course, reviewed *de novo*. *E.g., Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992); *LoVuolo v. Gunning*, 925 F.2d 22, 25 (1st Cir.1991). Findings of fact, however, will not be set aside unless they are demonstrated to be clearly erroneous. Fed.R.Civ.P. 52(a); *Dedham Water*, 972 F.2d at 457. In other words, we will give such findings effect unless, after carefully reading the record and according due deference to the trial court's superior ability to judge credibility, we form " 'a strong, unyielding belief that a mistake has been made.' " *Dedham Water*, 972 F.2d at 457 (quoting *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 152 (1st Cir. 1990)). As a result, where there are two permissible views of the evidence, the interpretation assigned by the lower court must be adopted. *Rodriguez–Morales v. Veterans Admin.*, 931 F.2d 980, 982 (1st Cir.1991) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

■ The clearly erroneous standard also ordinarily applies when we review a trial court's resolution of mixed questions of law and fact. *E.g., LoVuolo*, 925 F.2d at 25; *Henry v. Connolly*, 910 F.2d 1000, 1003 (1st Cir.1990). In such situations, however, we are obligated to determine whether the court's resolution was infected by legal error. *See LoVuolo*, 925 F.2d at 25. And, " 'if a trial court bases its findings upon a mistaken

impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.' " *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982)).[11]

■ With regard to Allied's attack upon the nature and extent of the injunction issued by the district court, our framework for review is equally well-established. Just as a trial court's decision on whether to exercise its equitable powers is committed to its sound discretion, *Taino Lines, Inc. v. M/V Constance Pan Atlantic*, 982 F.2d 20, 24 (1st Cir.1992), so too is its choice of equitable remedies, *Rosario–Torres v. Hernandez–Colon*, 889 F.2d 314, 323 (1st Cir.1989) (en banc). Thus, our role is to review only for an abuse of that discretion. *Taino*, 982 F.2d at 24. Underlying this deferential standard is a recognition that, in exercising its equitable powers, the district court " 'has had first-hand exposure to the litigants and the evidence and is in a considerably better position to bring the scales into balance than an appellate tribunal.' " *Hiraldo–Cancel v. Aponte*, 925 F.2d 10, 13 (1st Cir.) (quoting *Rosario–Torres*, 889 F.2d at 323) (ellipses omitted)), *cert. denied*, ―― U.S. ――, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991). Nonetheless, we will reverse if the court committed a clear error of law. *See In re Boston and Maine Corp.*, 719 F.2d 493, 495 (1st Cir. 1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984); *see also Feinstein v. Space Ventures, Inc.*, 989 F.2d 49, 51 (1st Cir.1993) (reviewing preliminary injunction).

It is against this backdrop that we evaluate the parties' claims.

## III.

### DISCUSSION

On appeal, the CAR and Poulos defendants together contend (1) that the court erred in

---

**11.** In a recent case, we explained our review standard for mixed questions in a slightly different manner: "The standard of review applicable to mixed questions usually depends upon where they fall along [a] degree-of-deference continuum: the more fact dominated the question, the more likely it is that the trier's resolution will be accepted unless shown to be clearly erroneous."

*In re Extradition of Howard*, 996 F.2d 1320, 1328 (1st Cir.1993) (reviewing findings made at extradition hearing) (citing *United States v. Mariano*, 983 F.2d 1150, 1158–59 (1st Cir.1993); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 990–91 (1st Cir.1990), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991)).

rejecting their arguments that two statutory exceptions—the "business extension" and "consent" exceptions—shielded them from liability; and (2) that the court erroneously refused to admit certain expert testimony. In addition, the Poulos defendants alone assert (1) that the court erred in ruling that plaintiffs' claims for equitable relief against them were not moot; (2) that the court erred in determining that Poulos had acted with sufficient knowledge to have violated Title III and the Maine anti-wiretap statute; (3) that the court erred in rejecting their claim that the statutory "good faith" defense relieved them of liability; and (4) that the court erred in denying them a jury trial on these latter two issues.

Plaintiffs' complaints essentially are (1) that the court made mistakes of law in fashioning equitable relief for the violations it found; (2) that the court erred in denying their Fed.R.Civ.P. 59(e) motion to amend judgment; (3) that the court erred in ruling that statutory damages under 18 U.S.C. § 2520 are legal, and not equitable, in nature; and (4) that the court erred in holding that the CAR defendants were not liable for use and disclosure violations under 18 U.S.C. § 2511(1)(c) and (d).

We discuss each of these arguments in turn.

### A. Defendants' Arguments

#### 1. Statutory Exceptions

As both the CAR and Poulos defendants point out, not all aural acquisitions of wire, oral, and electronic communications are illegal and give rise to liability under Title III and the Maine act. In fact, these statutes specifically delineate certain acquisitions that do *not* give rise to such liability. Defendants argue that the district court erred in ruling that two of these defined exceptions—the business extension and consent exceptions—did not apply. Our review, however, persuades us that the court's rulings are supported by the record.

#### a. The Business Extension Exception [12]

The business extension exception, often called the "extension telephone" exception, *see, e.g., Campiti v. Walonis,* 611 F.2d 387, 392 (1st Cir.1979), places outside the reach of Title III the monitoring of communications carried out by certain types of equipment and done in the ordinary course of business. It derives from 18 U.S.C. § 2510(4) and (5). Section 2510(4) defines the term "interception" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication *through the use of any electronic, mechanical, or other device.*" (Emphasis supplied). Section 2510(5), insofar as is relevant, then defines "electronic, mechanical, or other device" in the following manner:

> (5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication *other than*—
>
> > (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) ... furnished by [a] subscriber or user for connection to the facilities of [a wire or electronic communication] service and used in the ordinary course of its business[.]

(Emphasis supplied). Thus, if the monitoring conducted by the CAR defendants had been effectuated by means of a "telephone or telegraph instrument, equipment or facility, or any component thereof" which was both furnished by CAR for connection to the facilities of its communication service and used in the ordinary course of its business, defendants' actions would not constitute an interception and would be beyond the reach of Title III.

The district court determined that the business extension exception did not apply for two reasons: (1) because "the subject conversations were intercepted and recorded by a device configured by someone other than a provider of electronic communication service"; and (2) because "a legitimate business purpose did not exist at the time the subject conversations were intercepted." *See Poulos II,* slip op. at 17. Perhaps recognizing the amount of deference owed to the

---

**12.** The business extension exception is found only in the federal act. Thus, we confine our

discussion in this section of the opinion to federal law.

court's resolution of this paradigmatic mixed question of law and fact, defendants do not expend a great amount of energy attacking the factual findings underpinning the court's conclusions. Instead, they argue that the court's ruling was infected by erroneous legal reasoning. More specifically, defendants assert that, with regard to its first stated reason, the court misapprehended the technical requirements of the statute, and, with regard to its second stated reason, the court misconstrued the term "ordinary course of business."

We agree with defendants that, in concluding that the business extension exception did not apply, the court erred in its reasoning. Section 2510(5)(a) does not require that the acquisition device be configured by a provider of electronic communication service. Nor does it direct courts to conduct an inquiry into whether a "legitimate business purpose" for monitoring exists at the time of the challenged aural acquisition.

■ Nonetheless, we believe the district court's ultimate determination, that the business extension exception does not apply, is sustainable. Simply put, we are at a loss to see how the monitoring system used here, consisting as it did of "alligator clips attached to a microphone cable at one end" and an "interface connecting [a] microphone cable to a VCR and a video camera" on the other, can be considered to be a "telephone or telegraph instrument, equipment or facility, or a[ ] component thereof." [13] In so stating, we note that the CAR system is factually remote from the telephonic and telegraphic equipment courts have recognized as falling within the exception at 18 U.S.C. § 2510(5)(a). *See, e.g., Epps v. St. Mary's Hosp.,* 802 F.2d 412, 415–16 (11th Cir.1986) (dispatch console installed by telephone company considered telephone equipment); *Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 582–84 (11th Cir. 1983) (standard extension telephone implicitly considered telephone equipment); *Briggs v. American Air Filter Co., Inc.,* 630 F.2d 414, 416–20 (5th Cir.1980) (same); *James v. Newspaper Agency Corp.,* 591 F.2d 579, 581 (10th Cir.1979) (monitoring device installed by telephone company implicitly considered telephone equipment). Indeed, we think it self evident that the CAR system, far from being the type of exempt equipment contemplated by the authors of the business extension exception, is precisely the type of intercepting device Congress intended to regulate heavily when it enacted Title III.

■ We recognize that it is not ordinarily the province of appellate courts to make findings of fact or to resolve, in the first instance,

---

**13.** In support of its position that the CAR device should be so considered, defendants advance three arguments that are, at best, unpersuasive. First, defendants assert that the record evidence demonstrates that the monitoring device was comprised of standard electronic components which are "commonly used in telephone systems." Upon close scrutiny, however, it is clear that this assertion is premised solely upon an outrageous mischaracterization of the testimony of Jonathan Broome. Broome did not testify, as defendants suggest, that the components of the CAR system "are *commonly* used in telephone systems." (Emphasis supplied). Instead, he answered the question, "So, these wires were not uncommon parts or components for use in various ways *with* the [sic] telephone systems, were they?" by responding, "No. It was all—you don't usually use balanced shielded audio cable for telephone, but it is quite acceptable to." (Emphasis supplied). In other words, rather than testifying that the components are *commonly* used *in* telephone systems, Broome stated that, though it was *unusual,* the components *could* acceptably be used *with* telephone systems. In our view, such testimony is not helpful to defendants.

Second, defendants claim that certain 1986 amendments to the federal anti-wiretap statute were intended to broaden the meaning of 18 U.S.C. § 2510(5)(a) so as to include equipment such as the CAR monitoring device. This argument flagrantly misconstrues the purpose of the congressional action. The legislative history makes it apparent that the 1986 amendments were aimed at *strengthening* the statute by updating it to reflect nearly twenty years of telecommunications advances. *See generally* S.Rep. No. 99–541, 99th Cong., 2d Sess. 1–11, *reprinted in* 1986 U.S.C.C.A.N. 3555–65. Despite defendants' contrary urgings, there is absolutely no evidence in this history suggesting that Congress meant to expand the parameters of the business extension exception so as to embrace almost all wiretapping equipment.

Finally, defendants seem to argue that the First Circuit, in *Campiti,* 611 F.2d at 392, read the "any telephone or telegraph instrument, equipment or facility, or any component thereof" provision out of § 2510(5)(a). We think it sufficient to state without elaboration that *Campiti,* when fairly read in context, does no such thing.

mixed questions of law and fact. Yet, where only one resolution of a predominantly fact-bound question would, on a full record, be sustainable, courts of appeals can, and often should, decline to remand where there has been an error committed. *See Dedham Water, 972 F.2d at 463; see also In re Two Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litigation, 994 F.2d 956, 968–69 (1st Cir.1993)* (appellate courts may eschew remand where remanding would be an empty exercise); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir.1992)* (where trial court "supportably 'made the key findings of fact' but applied the wrong rule of law, the court of appeals ha[s] the power, in lieu of remanding, simply to regroup the findings 'along the proper matrix' ") (quoting *United States v. Mora, 821 F.2d 860, 869 (1st Cir.1987)).* Here, given the trial court's findings regarding the nature of the monitoring device, the only sustainable ruling would be that the device was not a "telephone or telegraph instrument, equipment or facility, or a component thereof," and therefore not within the parameters of the business extension exception. Accordingly, we reject the argument that defendants are protected by this exception.[14]

### b. The Consent Exception

■ Both the federal and Maine acts specifically exempt from their prohibitions the interceptions of telephone calls where one or more of the conversants has consented to or, in the case of the Maine act, previously authorized the interception. *See* 18 U.S.C. § 2511(2)(d) and 15 M.R.S.A. § 709(4)(C).[15] As we have made clear, consent under Title III[16] need not be explicit; instead, it can be implied. *See Griggs–Ryan v. Smith,* 904 F.2d 112, 116 (1st Cir.1990). Implied consent is not, however, constructive consent. *Id.* "Rather, implied consent is 'consent in fact' which is inferred 'from surrounding circumstances indicating that the party *knowingly agreed* to the surveillance.' " *Id.* at 116–17 (quoting *United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988)) (brackets omitted) (emphasis supplied). In light of the prophylactic purposes of Title III, implied consent should not be casually inferred. *See id.* at 117.

Here, the record reflects and the district court found that Ralph Dyer was told of the "monitoring" of CAR employee telephone calls.[17] The record is not clear, however, as to whether Dyer was informed (1) of the manner—i.e., the intercepting and recording of telephone conversations—in which this monitoring was conducted; and (2) that he himself would be subjected to such monitoring. There was testimony tending to indi-

---

**14.** In their brief, the CAR defendants conclude their argument that the business extension exception applies with a very short equitable argument that their "good faith" reliance on the advice of others, including counsel, in installing the monitoring system should absolve them from liability. They do not, however, adduce any authority in support of this novel proposition. Moreover, in the course of rebuffing defendants' business extension exception argument, the district court supportably found that the interceptions here at issue were not effectuated to further the original purpose of the monitoring system. Defendants do not, and cannot, seriously contest this finding. Thus, the alleged good faith of the CAR defendants *in originally installing the system* is irrelevant.

**15.** In relevant part, 18 U.S.C. § 2511(2)(d) provides:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where ... one of the parties to the

communication has given prior consent to such interception....

Similarly, 15 M.R.S.A. § 709(4)(C) excludes from the reach of the statute those interceptors "given prior authority by the sender or receiver."

**16.** Because the "consent" standard under Title III is certainly no more stringent than the "prior authority" standard set forth in 15 M.R.S.A. § 709(4)(C), *see supra* note 15, and because, as will be demonstrated below, we rule that the district court did not clearly err in finding that the consent standard had not been met, we need only discuss the federal act in this section of the opinion.

**17.** Defendants' consent arguments involve only the actions of Ralph Dyer, and are not directed at the district court's summary judgment ruling that the consent exception does apply to the conversations involving Brooks Browne. Accordingly, we limit our discussion to whether Dyer consented to interceptions of his telephone conversations.

cate that he was so informed, which the district judge apparently chose not to credit, and testimony tending to indicate that he was not. In our view, the latter testimony, far from being incredible, was highly plausible.[18] Thus, there is no basis for us to conclude that the district court clearly erred in finding that Dyer was not told of the manner in which the monitoring was conducted and that he himself would be monitored. *Cf. Rodriguez–Morales,* 931 F.2d at 982 (district court's finding should not be disturbed where there are two permissible views of the evidence). And, without *at least* this minimal knowledge on the part of Dyer, we do not see how his consent in fact to the monitoring could be inferred from this record. *Cf. Griggs–Ryan,* 904 F.2d at 117 (implied consent inferred where defendant was informed (1) that all incoming calls, (2) on a particular line, (3) would be tape recorded). Accordingly, we reject the contention that the court erred in finding that defendants are not protected by the consent exception.

### 2. Refusal to Admit Expert Testimony

■ Defendants also assert that the court erred in refusing to admit, pursuant to Fed. R.Evid. 702, the testimony of their expert, G. Robert Blakey.[19] This argument does not require extended discussion.

Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." It is settled that " 'the admission of expert testimony under [Rule] 702 is within the discretion of the district court and will be reversed only for an abuse of that discretion.' " *Navarro de Cosme v. Hospital Pavia,* 922 F.2d 926, 931 (1st Cir.1991) (quoting *Forrestal v. Magendantz,* 848 F.2d 303, 305 (1st Cir. 1988)).

Here, the court granted plaintiffs' motion to exclude Blakey by stating: "I'm satisfied with regard to expert witnesses in this case that expert witnesses are not appropriate, ... and I have excluded both the plaintiffs' and the defendants' experts by appropriate action on their respective motions." Thus, it appears that the court, as factfinder, concluded that it could "understand the evidence [and] determine [the] fact[s] in issue" without the assistance of experts. Our review of this record persuades us that the court acted well within its discretion in so concluding.[20] Accordingly, we reject defendants' contention that the court erred in excluding Blakey's testimony.

### 3. Mootness

■ The Poulos defendants assert that plaintiffs' claims against them became moot

---

18. It is difficult to believe that the newly-installed CEO and Chairman of the Board would have assented to the intercepting and recording of his conversations by subordinates with whom he was engaged in a struggle for power.

19. Blakey, described by the CAR defendants as "one of the drafters and architects" of Title III, would, in defendants' words, "[have] address[ed] the many mixed questions of law and fact which [arose] in this action...." Indeed, a review of the Poulos defendants' offer of proof regarding Blakey reveals that, if he had been allowed to testify, Blakey would have opined on virtually all of the mixed questions of law and fact in this litigation. Specifically, Blakey would have testified, *inter alia,* (1) that the CAR defendants' monitoring equipment was not a "device" as defined by 18 U.S.C. § 2510(5)(a) or 15 M.R.S.A. § 709(3); (2) that the monitoring equipment "was telephone 'equipment or facility' " [sic], *see* 18 U.S.C. § 2510(5)(a); (3) that the monitoring at issue was done "within the ordinary course of [CAR's] business," *see id.;* (4) that the actions and activities of the Poulos defendants "were carried out in a good faith reliance on a statutory authorization within the terms of 18 U.S.C. § 2520(d)"; and (5) that "under all the relevant facts and circumstances, attorneys in the position of the Poulos defendants ... would not have had 'reason to know' that the [intercepted] information was obtained in violation of law."

20. The court's decision rests upon especially firm ground with regard to Blakey. The Poulos defendants' offer of proof, *see supra* note 19, reveals that virtually all of Blakey's testimony would have been opinion testimony regarding (1) the state of mind of the Poulos defendants, and (2) the applicability of certain statutory provisions to the facts of this case. Leaving aside overall admissibility concerns, it is apparent that such testimony is not based upon "scientific, technical, or ... specialized knowledge" likely to be lacking in the able district judge who conducted this bench trial.

when plaintiffs amended their complaint so as to drop their claims for monetary damages.[21] In so doing, they point to the fact that, as the CAR defendants' attorneys, they would be bound by any injunction or restraining order issued against the CAR defendants alone. *See* Fed.R.Civ.P. 65(d).[22] In the Poulos defendants' view, the fact that they would be so bound, when combined with the fact that the trial was solely for equitable relief, means that complete relief could have been afforded to plaintiffs without their presence as named defendants. Thus, the argument concludes, after the damages claims were dropped, there was no longer a case or controversy between plaintiffs and themselves. We cannot agree with the Poulos defendants' argument.

Among its infirmities, this argument fails to recognize that plaintiffs sought from the Poulos defendants two forms of relief *other than* an injunction. First, plaintiffs sought a declaration that *the Poulos defendants themselves*, irrespective of their relationship with the CAR defendants, had violated, *inter alia*,

21. In their original complaint, plaintiffs sought declaratory and injunctive relief; actual, statutory, and punitive damages; and attorneys' fees. Eventually, however, plaintiffs amended their complaint so as to dismiss all their damages claims. As a result, the case was reduced to a completely equitable proceeding tried only before the district court.

22. The part of Rule 65(d) upon which the Poulos defendants rely states: "Every order granting an injunction and every restraining order ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys...."

23. Despite the fact that it is specifically made available by 18 U.S.C. § 2520(b)(1), the Poulos defendants contend that such a declaration, standing alone, would be "completely inappropriate" because it would have no future application. We are not persuaded by this argument. The Poulos defendants are the attorneys of record for the CAR defendants in the *Bowers* litigation. Surely a declaration that the Poulos defendants had disclosed and used the contents of intercepted communications, relevant to the *Bowers* lawsuit, in violation of Title III and the Maine act would be useful to plaintiffs in any motion they might file to disqualify the Poulos defendants in that case.

24. The Poulos defendants also assert that the injunction issued against them was improper because plaintiffs were not in danger of suffering

the disclosure and use provisions of Title III and the Maine act.[23] And second, plaintiffs sought from the Poulos defendants the attorneys' fees they had incurred in the course of protecting their statutorily created rights. Thus, even if we were to endorse for the sake of argument the dubious premise upon which the Poulos defendants' argument rests, we are still compelled to conclude that there was a very live case and controversy between plaintiffs and the Poulos defendants. Accordingly, we reject the contention that plaintiffs' claims against the Poulos defendants were mooted when they dropped their damages claims.[24]

### 4. Poulos's Knowledge

The Poulos defendants next contend that the district court clearly erred when, in determining that they had violated the disclosure and use provisions of Title III, it found that Richard Poulos knew or had reason to know that the interceptions at issue had been effectuated in violation of Title III. *See* 18 U.S.C. § 2511(1)(c) and (d), *supra* note 3.[25]

"actual or imminent, not 'conjectural' or 'hypothetical'" harm from them. *See Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (elaborating upon Article III's "case or controversy" requirement) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983)). In light of the imminence of *Bowers* and the fact that the Poulos defendants may still participate in it, we find this line of argument entirely unconvincing.

25. In the course of so ruling, the court also found that the Poulos defendants had violated the disclosure and use provisions of the Maine act. *See* 15 M.R.S.A. § 710(3)(A) and (B), *supra* note 3. The Poulos defendants also contest this finding, arguing (1) that the Maine act required the court to find that they had disclosed and used the intercepted information "actually knowing" that it had been *illegally* obtained, and (2) that the evidence could not support such a finding. This argument is built on a faulty legal foundation. Section 710(3)(A) and (B) do not require knowledge that the information was illegally intercepted; they merely require knowledge "that the information was obtained through interception [as that term is defined by the Maine act]." *See supra* note 3. Accordingly, because of its defective premise, and because a thorough review of the record convinces us that the court did not clearly err in implicitly finding that the Poulos defendants knew that the information they disclosed and used had been "obtained through interception," we reject this argument.

More particularly, they argue that the judge clearly erred in implicitly deciding that plaintiffs had met their burden of proving that Poulos knew or had reason to know that the statutory business extension and consent exceptions did not apply to the interceptions. After carefully considering this argument, we are not convinced.

■ It is settled that a person has not committed a disclosure or use violation under Title III unless s/he "knew or had reason to know that the interception [by which the information which was disclosed or used had been obtained] itself was in violation of Title III." *United States v. Wuliger,* 981 F.2d 1497, 1501 (10th Cir.1992); *see also Thompson v. Dulaney,* 970 F.2d 744, 749 (10th Cir.1992). In other words, "knowledge or reason to know of the illegality is an element of the offense." *Wuliger,* 981 F.2d at 1501. Thus, in a civil action, a plaintiff must demonstrate "1) the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of Title III." *Thompson,* 970 F.2d at 749; *see also Cheek v. United States,* 498 U.S. 192, 199–200, 111 S.Ct. 604, 609–610, 112 L.Ed.2d 617 (1991) (making clear that the common law presumption that every person knows the law ordinarily applies when courts construe criminal statutes). This demonstration includes a showing that any statutory exceptions asserted by a defendant do not, in fact, apply. *See Thompson,* 970 F.2d at 749.

■ Here, we perceive no clear error in the district court's implicit findings that the statutory defenses did not apply. Insofar as the Poulos defendants are challenging the court's finding regarding the business extension exception, we again observe that the exception applies only when, *inter alia,* the aural acquisition at issue is effectuated by means of a "telephone or telegraph instrument, equipment or facility, or a component thereof." *See* 18 U.S.C. § 2510(5)(a), *supra* at 279. As noted earlier, we think it evident that the monitoring equipment used by the CAR defendants cannot be so characterized. Moreover, there is no suggestion that Poulos misapprehended the nature of the equipment the CAR defendants used to monitor plaintiffs' calls. Given these facts, we discern no basis for upsetting the court's finding that Poulos knew or had reason to know that the business extension exception would not apply to the intercepted calls.

Similarly, insofar as the Poulos defendants are contesting the court's finding regarding the consent exception, we again note that consent, even if implied, must be " 'consent in fact.' " *See Griggs–Ryan,* 904 F.2d at 116–17 (quoting *Amen,* 831 F.2d at 378). As observed earlier, there is record evidence tending to indicate that Dyer [26] never was informed (1) of the manner in which the monitoring was being conducted; and (2) that he himself would be subjected to such monitoring. Moreover, there is record evidence from which a rational factfinder could have found, under a preponderance of the evidence standard, that Poulos was not laboring under the assumption that Dyer had been so informed.[27] Thus, we can discern no clear error in the district court's finding that Poulos knew or had reason to know that the consent exception would not apply to the intercepted calls.

Accordingly, we reject the Poulos defendants' challenge to the court's finding that Poulos knew or had reason to know that the interceptions violated Title III.

### 5. The Poulos Defendants' Good Faith Defense

The Poulos defendants' next argument, that the good faith defense provided for in 18

---

26. *See supra* note 17.

27. For example, in response to a question at trial regarding a journal entry made by Dyer, Poulos testified: "You people didn't know about *and Dyer didn't know about the wiretaps* on August 25 or so and when he's talking about sue—[sic]." Also, when Poulos disclosed the contents of the tapes to counsel for CAR's Chapter 11 trustee, he informed them that the tapes might have been criminally obtained.

U.S.C. § 2520(d) [28] exonerates them, is a variation on this same theme. In essence, the Poulos defendants claim that Poulos, in good faith, believed that the business extension and consent exceptions applied and were "statutory authorization[s]" for the wiretapping that occurred. Thus, they assert, they have a complete defense against plaintiffs' civil claims. Again, we do not agree.

As we have stated, the district court sustainably found that Poulos disclosed and used the contents of intercepted communications despite, at the very least, having had reason to know that the interception was effectuated in violation of Title III. Therefore, even if we assume *arguendo* that the term "statutory authorization" in § 2520(d) encompasses the business extension and consent exceptions (a matter that we do not now decide), it is evident that any belief on Poulos's part that these exceptions did apply could have been premised only upon mistakes of law. And, as we have held, nothing in § 2520(d) supports a conclusion that the good faith defense applies where a defendant *mistakenly* believes that there exists a statutory authorization for the wiretapping. *See Campiti*, 611 F.2d at 394–95 (mistaken belief that statutory exceptions apply does not give rise to a good faith defense); [29] *see also Heggy v. Heggy*, 944 F.2d 1537, 1542 (10th Cir.1991) (§ 2520(d) does not embrace mistake of law), *cert. denied*, —— U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 651 (1992). Accordingly, we reject as meritless the Poulos defendants'

argument that they are protected by the good faith defense of § 2520(d).[30]

### 6. Entitlement to Jury Trial

 Finally, in one sentence, the Poulos defendants assert:

> Due to the professional implications, the exposure to substantial attorneys [sic] fees, the [district] court's decision to determine whether there was a use and disclosure violation under both [Title III] and the Maine Act, and the criminal nature of the statute involved, [the Poulos defendants] should have been accorded a jury trial on the issues of whether they used the tapes knowing or with reason to know of the illegality and the good-faith defense.

They do not, however, explain how the presence in this case of "professional implications," an attorneys' fees request, use and disclosure issues, and the fact that Title III also contains criminal provisions renders this action an essentially legal one. Nor do they cite to any authority from which we can derive such an inference. As such, their argument is perfunctory and we will not address it. *See Innamorati*, 996 F.2d at 468.[31]

### B. Plaintiffs' Arguments

#### 1. Scope of the Injunction

Plaintiffs' primary argument on appeal is their complaint concerning the reach of the

---

**28.** In relevant part, 18 U.S.C. § 2520(d) states: "A good faith reliance on . . . a statutory authorization . . . is a complete defense against any civil or criminal action brought under this chapter or any other law."

**29.** The Poulos defendants point out that the term "statutory authorization" was added to § 2520(d) after *Campiti* was handed down and assert, without any elaboration, that this means that § 2520(d) "may in fact now exempt a mistake of law." Given the dearth of contexts where subjective mistakes of law allow a defendant to avoid liability, *see Cheek*, 498 U.S. at 199–200, 111 S.Ct. at 609–610, we find this perfunctorily made argument to be highly suspect. At any rate, we deem it waived, *see United States v. Innamorati*, 996 F.2d 456, 468 (1st Cir.1993) (issues adverted to in a perfunctory manner and without developed argumentation are deemed waived on appeal), *cert. denied*, —— U.S. ——, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993).

**30.** Because § 2520(d) does not shield the Poulos defendants from plaintiffs' Title III claims, it also obviously does not, despite their argument to the contrary, shield them from plaintiffs' claims under the Maine act.

**31.** The Poulos defendants do, without elaboration, advert to authority which enunciates the settled rule that an action for declaratory relief which is essentially legal in nature gives rise to the right to a jury trial. *See, e.g., Simler v. Conner*, 372 U.S. 221, 223, 83 S.Ct. 609, 611, 9 L.Ed.2d 691 (1963); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504, 79 S.Ct. 948, 953, 3 L.Ed.2d 988 (1959). They do not, however, make any attempt to demonstrate the applicability of this authority *to the facts of this case.* Accordingly, we deem their efforts insufficient to preserve this issue for appellate review. *See Innamorati*, 996 F.2d at 468.

injunction issued by the district court. The argument has three components: (1) that the court abused its discretion in permitting defendants to disclose and/or use the intercepted recordings in *Bowers;* (2) that the court also abused its discretion in failing to enjoin the *Bowers* litigation; and (3) that the court erroneously thought itself restricted to the relief provided for in 18 U.S.C. § 2515 [32] when it issued the injunction. We address each branch of plaintiffs' argument in turn.

### a. Disclosure and/or Use of the Recordings in Bowers

The first aspect of plaintiffs' argument is not difficult to comprehend. They contend that the court's injunction, insofar as it permits defendants to disclose and/or use the contents of the tapes for admissibility determinations in *Bowers,* must be reversed. In plaintiffs' view, Title III [33] simply does not allow for any disclosures and/or use of illegally intercepted material in civil cases. After careful consideration, we disagree with this position.

In making their argument, plaintiffs rely upon the fact that Title III, without exception, makes criminal "disclosures" and/or "uses" of illegally intercepted material. In our view, however, there are at least two reasons why the lack of any such explicit exception does not dictate the conclusion reached by plaintiffs.

First, we think it important to note:

A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole.

2A Norman J. Singer, *Sutherland Statutory Construction,* § 46.05, at 103 (5th ed. 1992).

Here, if we were to interpret the criminal provisions of Title III in the manner suggested by plaintiffs, we would render the statute unenforceable.[34] Thus, we must reject plaintiffs' interpretation as violative of a fundamental tenet of statutory construction.

Moreover, we think that Congress, in enacting § 2515, *see supra* note 32, made clear its endorsement of disclosures and/or uses of illegally intercepted material for the adjudicatory purposes contemplated by the district court. As noted, § 2515 bans the introduction into evidence of both illegally intercepted material and any evidence derived therefrom. Implicit in this ban, we believe, are two assumptions: (1) that the intercepted material will be presented to a court or jury for an initial adjudication of whether it was acquired illegally; and (2) that a court will thereafter determine whether other evidence was derived from the intercepted evidence. Simply put, we are at a loss to see how these functions could be performed without the types of adjudicatory "disclosures" and/or "uses" that plaintiffs view as banned by Title III.

■ Accordingly, we reject the argument that the court erred in permitting future disclosures and/or uses of the recordings and transcriptions here at issue for the limited purpose of aiding it in the making of admissibility determinations in *Bowers.*

Despite the fact that the court's injunction explicitly made reference only to disclosures and/or uses in the context of admissibility determinations, the parties also disagree over whether the tapes at issue can be used "for purposes of impeachment" in *Bowers.* Because we believe that this is an important issue certain to arise during the course of that litigation, we address it at this time.

We start with the obvious. As we have observed, Title III makes criminal the inten-

---

**32.** In relevant part, 18 U.S.C. § 2515 provides:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court ... if disclosure of that information would be in violation of this chapter.

**33.** Again here, the parties' discussion of the issue centers around Title III. Therefore, we confine our analysis to federal law.

**34.** After all, a court (or jury) would almost never be able to determine whether an interception violated Title III without having the interception "disclosed" in court and "using" this interception to inform its determination.

tional disclosure and/or use of information obtained through unauthorized interceptions of wire, oral, or electronic communications (when the discloser/user knows or has reason to know that the interception was unauthorized). *See* 18 U.S.C. § 2511(1)(c) and (d), *supra* note 3; *see also Gelbard v. United States,* 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). It also generally reserves as a remedy to anyone subjected to an unlawful interception "such . . . equitable or declaratory relief as may be appropriate." *See* 18 U.S.C. § 2520(b), *supra* note 5. We think it apparent, therefore, that, in order to provide aggrieved plaintiffs with "appropriate" relief, courts ordinarily should completely enjoin persons in possession of illegally intercepted information from disclosing and/or using that information.

With regard to how, if at all, illegally intercepted communications may be disclosed and/or used *as evidence* in court proceedings, Title III is more explicit. As noted above, § 2515 states that "no part of the contents of such communication and no evidence derived therefrom may be received in evidence. . . ." *See supra* note 32. Despite the unequivocal nature of this statutory language, however, several courts, including this one, have allowed the *government* to disclose and use the contents of illegally intercepted communications in order to impeach testifying *criminal* defendants. *See United States v. Vest,* 813 F.2d 477, 484 (1st Cir.1987); *United States v. Winter,* 663 F.2d 1120, 1154 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983); *see also, e.g., United States v. Echavarria–Olarte,* 904 F.2d 1391, 1397 (9th Cir.1990); *United States v. Caron,* 474 F.2d 506, 508 (5th Cir.1973). In so doing, these courts, either explicitly or implicitly, have relied upon a passage in the legislative history of Title III which indicates a congressional desire to incorporate, *inter alia,* the impeachment exception of "search and seizure law" [35] into the Title III calculus. *See generally Caron,* 474 F.2d at 510 (interpreting the meaning of S.Rep. No. 1097, 90th Cong., 2d Sess. at 96, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2184–85).[36]

Every federal court that has passed on the question has, however, declined to extend this impeachment exception to civil actions brought under Title III. *See, e.g., Wuliger,* 981 F.2d at 1506; *Anthony v. United States,* 667 F.2d 870, 879 (10th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). In so doing, these courts, have taken note of (1) the "overriding concern for protection of privacy . . . [Title III] sets out," *Wuliger,* 981 F.2d at 1506, and (2) the fact that § 2515, by its terms, allows for no exceptions. They, therefore, have proceeded from the premise that " 'what is not permitted [by the Act] is forbidden.' " *Id.* (quoting *Fultz v. Gilliam,* 942 F.2d 396, 401 (6th Cir.1991)). Then, these courts have observed that the allowance of an impeachment exception derives from the references in the legislative history to "search and seizure law" and the Supreme Court's decision in *Walder. See* S.Rep. No. 1097, 90th Cong., 2d Sess. at 96, *reprinted in* 1968 U.S.C.C.A.N. at 2112, 2184. Thus, because "[n]ormal search and seizure laws have arisen in the context of the Fourth Amendment which is directed against the government, not against private individuals," *Anthony,* 667 F.2d at 879, and because the Fourth Amendment does not apply in civil actions not involving the government, *see id.,* these courts have, as stated above, declined to recognize an impeachment exception to § 2515 in civil proceedings, *see id.; see also Wuliger,* 981 F.2d at 1506.

**35.** In criminal law, evidence obtained in violation of the Fourth Amendment can be used for the limited purpose of attacking a testifying defendant's credibility. *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954). It can, however, only be used to impeach on matters "plainly within the scope of the defendant's direct examination." *United States v. Havens,* 446 U.S. 620, 627, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980). Moreover, the tainted evidence can only be used to impeach the criminal defendant him/herself; it cannot be used to impeach other witnesses, even other defense witnesses. *James v. Illinois,* 493 U.S. 307, 313, 110 S.Ct. 648, 652, 107 L.Ed.2d 676 (1990).

**36.** The legislative history's reference to the impeachment exception is made indirectly by means of an approving citation to *Walder,* the case wherein the impeachment exception was created. *See supra* note 35.

We find this line of reasoning persuasive,[37] and accordingly limit the impeachment exception of § 2515 to criminal actions brought pursuant to Title III. Therefore, it follows that the illegal interceptions (and their transcriptions) at issue in this litigation cannot, pursuant to the criminal impeachment exception, be introduced into evidence for impeachment purposes in *Bowers*.

### b. Failure to Enjoin Bowers

■■■ The second component of plaintiffs' argument has two parts: that, in failing to enjoin *Bowers*, the district court (1) erroneously relied upon Fourth Amendment "independent source" jurisprudence,[38] and (2) erroneously overlooked the fact that Title III "flatly" bans disclosures and uses of illegally intercepted material.[39] In our view, plaintiffs misconstrue the approach taken by the district court.

With respect to plaintiffs' first claim, the court did not hold that the evidence derived from the illegal interceptions would be admissible in *Bowers* pursuant to the independent source rule.[40] Instead, the court found that "the evidence presented at trial demonstrated the existence of information upon which the allegations in *Bowers v. Allied* could be based *independent of the subject tapes*." *Poulos II*, slip op. at 29–30 (emphasis supplied). In other words, the court found that evidence *other than* that which was on the tapes (and "in no way attributable to the existence of the subject tapes," *see id.* at 30) could support the lawsuit. Thus, the independent source rule, which is a means for admitting evidence springing from independent sources despite the fact that the evidence replicates tainted evidence, was not a basis for the district court's holding.

With regard to plaintiffs' second claim, we believe it sufficient to state that the court's injunction does not contravene the purposes of Title III.[41] Contrary to plaintiffs' assertions, Title III does not "flatly" ban *all* dis-

---

**37.** In an attempt to counteract this authority, the Poulos defendants contend (1) that *Walder* and its progeny do not explicitly state that the impeachment exception should be available only in criminal cases, and (2) that the concerns underlying the exception (e.g., the prevention of untruthful testimony) are equally applicable in the civil context. While this argument has some force, we think, in light of (1) the unequivocal language of § 2515, (2) the broad remedial purposes of Title III, and (3) the restrictions the Supreme Court has put on the impeachment exception, *see supra* note 35, that the exception we have read into § 2515 must be strictly construed. *Cf. Vest*, 813 F.2d at 480–84 (declining to read the legislative history at issue as empowering courts to read further exceptions into § 2515). As we have noted, the exception derives from a specific reference to "search and seizure law" and a citation to *Walder*, neither of which is *directly* applicable in the civil context. Thus, any application of the exception to civil cases would be based upon extrapolation. In light of the three above-stated factors which incline us towards a strict construction of the exception, we simply do not believe that such an extrapolation would be appropriate in this instance.

**38.** The independent source rule "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 433, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984); *see also United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988).

**39.** To be more specific, the second part of plaintiffs' argument is that, to the extent that the court may have "balanced the equities" in deciding not to enjoin *Bowers*, it was in error. *Cf. Burlington R.R. Co. v. Bair*, 957 F.2d 599, 601–02 (8th Cir.) (indicating that, in considering the propriety of injunctive relief, it is not the role of the courts to balance the equities between the parties where Congress has flatly banned the conduct sought to be enjoined), *cert. denied*, — U.S. ——, 113 S.Ct. 69, 121 L.Ed.2d 36 (1992).

**40.** We recognize that the court did make reference to the independent source rule in denying plaintiffs' Fed.R.Civ.P. 59(e) motion to amend the judgment. We discuss the propriety of this reference in the next section of this opinion. *See infra* at 289–90.

**41.** We are aware that plaintiffs' argument ties in with their general concern, expressed throughout their brief, that allowing *Bowers* to proceed will undermine the purposes of Title III and the Maine act. If, however, there is independent evidence upon which the allegations of *Bowers* are premised, and if, as we shall explicitly urge it to do, *see infra* at 289–90, the district court takes pains to ensure that the contents of the illegally intercepted conversations, and any evidence derived therefrom, are not used or disclosed in the course of that litigation (other than in the course of making admissibility determinations), we do not believe that plaintiffs' concern will come to fruition.

closures and uses of illegally intercepted communications. Instead, as we have explained, it *generally* bans such disclosures and uses while, either explicitly or implicitly, allowing for certain exceptions (i.e., an impeachment exception in criminal cases, *see supra* at 287, and an "adjudication" exception, *see supra* at 286–87, in all cases). In our view, the court's injunction is consistent with this statutory nuance.

Accordingly, we reject plaintiffs' assertion that the court's failure to enjoin *Bowers* was infected by legal error.

### c. Erroneous Exclusive Reliance on Section 2515

The final facet of plaintiffs' argument, that the court erroneously thought itself restricted to the relief provided for in 18 U.S.C. § 2515, *see supra* note 32, when it declined to enjoin *Bowers,* does not require extended discussion. While, as we shall discuss below, the court did reveal a somewhat cramped view of the scope of its equitable powers in denying plaintiffs' Fed.R.Civ.P. 59(e) motion to amend judgment, *see infra* at 289–90, the record clearly reveals that no such restrictive view impaired its treatment of plaintiffs' initial request for injunctive relief. In fact, contrary to plaintiffs' contention, the court's injunction order explicitly states that the decision not to enjoin *Bowers* was based upon the evidence, and not upon a perceived lack of legal power to order the remedy requested. *See Poulos II,* slip op. at 30 ("The Court is satisfied that the injunctive relief sought is beyond the scope warranted *by the evidence presented at trial.*") (emphasis supplied). Accordingly, we find this claim of legal error to be without merit.

### 2. Motion to Amend Judgment

Plaintiffs next argue that the district court erred in denying their Fed.R.Civ.P. 59(e) motion to amend judgment. In this motion, plaintiffs averred that they were seeking, *inter alia,* to "clarify" the court's previous injunction order. In reality, however, as the district court noted, plaintiffs' motion actually sought (1) "additional relief" not requested at trial or in the amended complaint, and (2)

evidentiary rulings in *Bowers.* Because the court acted well within its discretion in denying this relief, we cannot agree with plaintiffs that the court erred in denying their motion. Because, however, we do agree with plaintiffs that the court's denial order evinced a misunderstanding of (1) the scope of its powers, and (2) the requirements of Title III, we do pause, albeit briefly, to add a few *caveats.*

■ The decision to grant or deny a Rule 59 motion is committed to the wide discretion of the district court and must be respected absent abuse. *E.g., Fernandez v. Leonard,* 963 F.2d 459, 468 (1st Cir.1992). Of course, this discretion attaches to a court's decision on whether to allow a party to argue new material or a new theory under Rule 59. *See Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 25 (1st Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *but see FDIC v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986) (motion to alter or amend judgment "*cannot* be used to raise arguments which could, and should, have been made before the judgment issued") (emphasis supplied).

■ Here, plaintiffs' Rule 59 motion sought relief not requested in their amended complaint. For example, plaintiffs asked the court to order, *inter alia,* (1) that defendants "turn over for seal or destruction every illegal tape and transcript, and any record of any sort containing any contents of illegal interceptions"; (2) that the Poulos defendants and Daniel Lilley and his law firm [42] be enjoined from further participation in *Bowers;* (3) that the aforementioned attorneys be prohibited from communicating with whatever attorney/s might replace them as counsel in *Bowers;* (4) that the disclosure and/or use of depositions taken by Poulos be enjoined; and (5) that defendants with exposure to the intercepted recordings be prohibited from testifying in *Bowers.* In their complaint, however, plaintiffs requested no such relief as an alternative to the enjoining of *Bowers.* Accordingly, insofar as the court denied plaintiffs' motion because the motion sought "additional relief", we cannot say that it

---

**42.** Mr. Lilley has represented the CAR defendants throughout this litigation.

abused its discretion.[43]

Nevertheless, we are concerned about certain dicta contained in the district court's order. In the course of denying plaintiffs' Rule 59 motion, the court indicated (1) that 18 U.S.C. § 2515, see supra note 32, and (2) the independent source rule, see supra note 38, would constrain its rulings in Bowers. We think that the court erred in so indicating. First, we wish to emphasize that, as always, the court has broad discretion, through discovery orders, evidentiary rulings, and the like, in deciding how it will manage that trial. See, e.g., Serrano–Perez v. FMC Corp., 985 F.2d 625, 628 (1st Cir. 1993) (district court has broad discretion in managing litigation). However, in Bowers, this discretion must be tempered by the court's obligation, flowing from the protections set forth in Title III and the Maine act, to ensure that the illegally intercepted material, and any evidence derived therefrom, not be disclosed or used in that proceeding (other than for the purposes we have already approved, see supra section III.B.1.a. of this opinion). In our view, this discretion and concomitant obligation will require the court to consider the possibility of rulings that go beyond § 2515, which is directed solely at evidence. For example, in order to guard against the future use of the intercepted material, as the term use is generally understood, we believe that the court should consider matters such as (1) the disqualification of counsel, and (2) the prohibition of any communication between any disqualified counsel and replacement counsel.

■ This leads to our second point. In making its rulings, the court should be aware that, as a general rule, Fourth Amendment doctrines like the independent source rule do not apply in private civil actions implicating Title III. As the Supreme Court has stated:

The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's private life. That wrong ... is fully accomplished by the original search without probable cause.

United States v. Calandra, 414 U.S. 338, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974) (allowing a grand jury witness to be asked questions based on evidence obtained in violation of Fourth Amendment, because such questions "work no new Fourth Amendment wrong").

■ Title III, on the other hand, generally proscribes, inter alia, the disclosure and/or use of illegally intercepted material. In other words, it prohibits more than just the initial wrongful invasion. See Gelbard, 408 U.S. at 51–52, 92 S.Ct. at 2362–2363. Thus, under Title III, the disclosure and/or use of information obtained through a wrongful invasion amounts to a separate injury prohibited by statute, and makes a person subjected to such a disclosure and/or use "a victim, once again, of a federal crime." Id. at 52, 92 S.Ct. at 2363 (ruling that grand jury witness may not be asked questions based on evidence obtained by illegal wiretapping).

In sum, the court did not abuse its considerable discretion in denying plaintiffs' Rule 59 motion. However, in making discovery, evidentiary, or other rulings in Bowers, the court should not (1) assume that it is limited to the relief set forth in § 2515, or (2) assume the applicability of judicially developed Fourth Amendment jurisprudence.

### 3. Statutory Damages

■ Plaintiffs' third argument is that the court erred in determining that the statutory damages provided for in 18 U.S.C. § 2520(c), see supra note 5, are legal, rather than equitable, in nature. Defendants respond that plaintiffs did not preserve this argument for appellate review. We agree with defendants that this issue is not properly preserved.

As noted earlier, see supra note 21, plaintiffs' original complaint sought declaratory and injunctive relief; actual, statutory, and punitive damages; and attorneys' fees. As the trial date approached, however, plaintiffs

---

**43.** Similarly, we cannot say that the court abused its discretion in deferring the making of evidentiary rulings in Bowers.

apparently determined that they did not wish to have a jury hear any portion of this case. Accordingly, they amended their complaint so as to drop all but their statutory damages claims. Then, in their final pretrial memorandum, plaintiffs stated: "If the Court should decide that statutory damages are a legal remedy so as to support the Defendants' jury demand, then the Allied Plaintiffs will dismiss their claim for statutory damages." Subsequently, the court ruled that statutory damages are legal in nature. Thus, plaintiffs further amended their complaint so as to omit their prayer for statutory damages.

Plaintiffs now seek to resurrect their statutory damages claim. This they cannot do. If plaintiffs wished to preserve this issue, they should have presented their case for statutory damages to a jury. *Cf., e.g., Foley v. City of Lowell,* 948 F.2d 10, 22 (1st Cir. 1991) (" 'It is black letter law that it is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal.' ") (quoting *Beaulieu v. IRS,* 865 F.2d 1351, 1352 (1st Cir.1989)). If they were displeased with the results of the jury's deliberations, plaintiffs next could have asked the court to set the jury's determination aside. If they still were not satisfied, plaintiffs then could have appealed the court's decision to commit the statutory damages question to the jury in the first instance.

Plaintiffs' approach to this issue, if endorsed, would undermine the efficient administration of justice. Had plaintiffs presented their claim for statutory damages to a jury, and had they received the award they sought (either from the jury itself or from the court after a successful Rule 50 motion for judgment as a matter of law), the need for an appeal on this point would have been obviated. Moreover, even if plaintiffs had not received the relief they were seeking, the issues underlying the propriety of a statutory damage award would have been fully litigated at the same time as the other issues animating this litigation. Thus, we would

have been in a position, on a developed record, either to resolve the question ourselves or to remand for what would undoubtedly be a less involved process than the one plaintiffs now seek.

In sum, when plaintiffs amended their complaint so as to drop their claim for statutory damages, they irrevocably waived their right thereto. Accordingly, we need not reach the question of whether the court erred when it determined, prior to plaintiffs' final amendment, that statutory damages under § 2520(c) are legal in nature.

### 4. *Disclosure and Use Violations by the CAR Defendants*

Finally, in one-half of one page of their fifty-one page brief, plaintiffs contend that the district court committed legal error in ruling that the CAR defendants did not violate the disclosure and use provisions of Title III and the Maine act. The CAR defendants, utilizing just over three-quarters of one page of their forty-eight page brief, counter that any disclosures and uses on their part took place within the confines of the attorney-client relationship, and that such fact absolves them from liability under the relevant statutory provisions. Plaintiffs, again using less than one-half of one page of their forty-eight page reply brief, characterize this argument as "incomprehensible" and restate their position that the CAR defendants committed disclosure and use violations. Neither side, at any point, makes reference to any case law, statutory authority, or legislative history.

The issue here adverted to is an interesting one on which no federal appeals court has yet spoken: namely, do 18 U.S.C. § 2511(1)(c) and (d) (and, correspondingly, 15 M.R.S.A. § 710(3)(A) and (B)), *see supra* note 3, which by their terms prohibit the "disclos[ure] ... to any other person" and the "use" of illegally intercepted material, make it a crime to disclose and use such material during the course of attorney consultations? [44] Certainly, reasonable argu-

---

**44.** At least one federal judge, recognizing the inherent tension between the wording of the statute and the need for effective trial preparation,

has held that the disclosure of the contents of intercepted recordings to counsel, *for the purpose of preparing a · defense,* is not a crime. *See*

ments might be made on both sides of this question of first impression. And, in accordance with our usual practice, we do not wish to decide it without the benefit of such argumentation and a developed record. Accordingly, we deem the issue to have been waived in this instance. *See Innamorati*, 996 F.2d at 468.

## IV.

## CONCLUSION

For the reasons herein stated, we affirm the district court in all respects. *Affirmed. No costs.*

McQuade v. Michael Gassner Mech. & Elec. Contractors, Inc., 587 F.Supp. 1183, 1188–89 (D.Conn.1984) (Cabranes, J.); *see also Sound Unlimited, Inc. v. Video Shack Inc.*, 661 F.Supp. 1482, 1488 (N.D.Ill.1987) (alluding to but not

deciding issue); *cf. supra* at 286–87 (disclosures and uses for purposes of adjudication not banned by Title III).