Filed 11/18/14  Unmodified opinion attached

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MATTEO NEGRO,<br><br>    Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br><br>NAVALIMPIANTI USA, INC.,<br><br>    Real Party in Interest. | H040146<br>(Santa Clara County<br>Super. Ct. No. 1-13-CV239634)<br><br><br>ORDER DENYING MODIFICATION AND MODIFYING OPINION ON THE COURTS OWN MOTION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 21, 2014, be modified as follows:

1. On the Court's own motion, the opinion is modified to delete footnote 1 on page 5, which will require renumbering of all subsequent footnotes.

2. On the signature page, line 2, the name "PREMO, J." is replaced with "ELIA, J." so the signature page reflects the correct panel as follows:

_____
RUSHING, P.J.

WE CONCUR:


_____
ELIA, J.
_____
MÁRQUEZ, J.


3.  Except as granted above, petitioner's request to modify the opinion is denied. The phrase "this order" on page 31 of the typed opinion speaks as of the date of the trial court's issuance of an order complying with this court's mandate, and not as of the date of this court's decision.


There is no change in judgment.


_____
RUSHING, P.J.


WE CONCUR:


_____
ELIA, J.


_____
MÁRQUEZ, J.

Filed 10/21/14 Unmodified version
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| MATTEO NEGRO, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SANTA CLARA COUNTY, <br><br> Respondent; <br><br> NAVALIMPIANTI USA, INC., et al., <br><br> Real Parties in Interest. | H040146 <br> (Santa Clara County <br> Super. Ct. No. 1-13-CV239634) |


This original proceeding arises from efforts by real party in interest Navalimpianti U.S.A., Inc. (Navalimpianti) to obtain copies of e-mail messages stored by real party in interest Google, Inc. (Google), on behalf of petitioner Matteo Negro. Navalimpianti caused a subpoena to be served on Google, which Negro moved to quash. Respondent court denied the motion, and ordered Google to produce the e-mails, based on its conclusion that Negro had consented, or was deemed to have consented, to their production. We hold that this order could not be sustained on the record before respondent court, and thus constituted an abuse of discretion when the order was made. Since then, however, Negro has been ordered by a Florida court to give his express consent to disclosure, and he has complied with that order by e-mailing Google and

consenting to its production of the e-mails sought. We hold that this express consent takes the contemplated production outside of the Stored Communications Act, 18 United States Code section 2702 (SCA or Act), and permits Google to make the requested disclosure, notwithstanding claims by Negro to the contrary. We further hold that in light of Negro's valid express consent to disclosure, the Act poses no impediment to a subpoena compelling Google produce the messages. We will therefore issue a compulsory writ directing respondent court to modify its order to conform to the consent actually given and to accommodate certain other concerns raised by the record.

BACKGROUND

### A. Underlying Action

In March 2011 Navalimpianti filed a complaint in the Circuit Court of Dade County, Florida against Negro and others. The complaint alleged that a number of Navalimpianti's former officers and employees, including Negro, had committed various breaches of duty pursuant to a conspiracy which culminated in their entry into competition with Navalimpianti.

In June 2012, Navalimpianti applied to the Florida court for authority to take Google's deposition, and seek documents from it, in California. In support of the motion Navalimpianti asserted that Negro had an e-mail address in Google's Gmail domain, which he had used to conduct business during the time period relevant to the complaint. Navalimpianti sought to discover "any communications between Matteo Negro his co-defendants and the persons who participated in the conduct alleged in the pending Complaint." As described in an attached exhibit (Exhibit A), the materials sought were "[a]ll e-mails . . . from any gmail account belonging to or maintained by Matteo Negro" under a specified username, from June 1, 2009, through June 2010, between Negro and 14 specified persons or entities.

2

At the hearing on the motion, counsel for Navalimpianti indicated that efforts to obtain production of the e-mails directly from Negro had yielded only messages from Navalimpianti's own server. Counsel also reported that when he sought to question a supposedly knowledgeable witness about the existence of additional relevant e-mail messages, the witness had invoked the Fifth Amendment. Negro's chief ground of opposition to the motion was that the discovery should be directed to Google's agent for service of process in Florida. Counsel for both parties agreed that Google could not be expected to "filter" messages for relevance or privilege. Negro's counsel further asserted that if production were made, it would be necessary to "appoint[] a special master or someone to review all of this."

The Florida court granted the motion, authorizing Navalimpianti "and the applicable California court to issue a subpoena duces tecum for Google Inc. requesting the documents described in Exhibit A."

### B. Subpoena and Petition to Quash

Navalimpianti engaged California Attorney Idell, who issued a deposition subpoena on December 19, 2012, directing Google's custodian of records to appear and produce the e-mails described in Exhibit A. The subpoena was duly served on Google, and on January 9, a Google representative faxed a letter to Idell objecting on multiple grounds. These included that "[s]ection 2702(a) of the federal Stored Communications Act prohibits Google from disclosing the content of electronic communications pursuant to a subpoena. [Citations.] The appropriate way to seek such content is to direct your request to the account holder who has custody and control of the data in the account. [Citations.] If the account holder is a party to the underlying litigation, you may serve a document request on the account holder for the content sought. [Citations.]"

Negro engaged California counsel, who filed a petition in respondent court to quash the subpoena under the Interstate and International Depositions and Discovery Act

3

(Code Civ. Proc., §§ 2029.100-2029.700).  In support of the petition counsel contended that the subpoena sought materials beyond the scope of permissible discovery, was not sufficiently particularized, sought privileged and irrelevant matter, and was defective in various other respects.  The initial moving papers did not invoke the Act.

### C.  *Proceedings Before Florida Magistrate*

Perhaps in reaction to Google's objections, Navalimpianti returned to the Florida court for an order directing Negro "to execute an Authorization to Release Electronic Communications in a form acceptable to Google."  The matter was initially heard by a magistrate, who issued an order on June 12 in which she declined to reach the merits, reasoning that the question whether to compel Negro's consent was more appropriately addressed in California.

Navalimpianti filed exceptions to the magistrate's report, urging the Florida court to adopt instead an order which would (1) identify Negro as "the registered account holder and sole authorized user" of a specified Gmail address; (2) recite that Negro "consents to Google delivering and divulging the contents of his Gmail account"; (3) recite a "find[ing]" that this consent was "sufficient pursuant to the Stored Communications Act 18 U.S.C. § 2701 *et seq*"; (4) direct Negro to e-mail a copy of the order to Google attached to an e-mail message stating that "the user consents to Google's disclosure of" documents as described in Exhibit A to the original motion for appointment of a commissioner; and (5) call for production of the messages directly to counsel for Navalimpianti, unless Google was unable to limit disclosure to messages matching the described characteristics, in which case they were to be delivered to a third party.

### D.  *Proceedings on Motion to Quash*

Navalimpianti's objections to the magistrate's report were not heard in Florida until September 26, 2013.  Meanwhile, in California, counsel for Navalimpianti issued a

4

notice of deposition to Google, setting September 19 as the date for testimony and production of documents in accordance with the subpoena. Negro's California attorney now asserted for the first time that discovery was barred by the SCA. He insisted that Negro had not consented to disclosure, but had instead "litigated the issue in Florida and . . . filed a petition in the Santa Clara County Superior Court to litigate the issue here." He asserted—quite correctly at the time—that the Florida magistrate had declined to "force consent through a Florida Court order . . . . Therefore, there is no consent for this Court to consider . . . ."

On July 11, 2013, respondent court issued a tentative ruling denying the petition to quash and directing Google to produce the messages to counsel for Navalimpianti, who would have 15 days to prepare a privilege log to be delivered to counsel for Negro along with materials not withheld pursuant to objection. Any objections would be resolved by the Florida court. On the issue of consent, the tentative ruling stated that the court had the power to require Negro's consent; that prior efforts by Navalimpianti to obtain the messages directly from Negro had been unsuccessful; and that "[t]herefore, resort to the electronic data bailee would seem to be justified." It then continued, in language that would be incorporated in the order now under review, "The concept of court ordered consent as an exception to the [SCA] applies here. That order comes from the Florida court's order for appointment of a commissioner to take the testimony and documents from Google as well as from this court which now has denied the petition to quash the subpoena. It matters little whether the *consent* is the result of the coercion of discovery sanctions or the order of the court over the steadfast objection of the party."[1] (Italics in original.)

---

[1] The tentative ruling was issued by Judge Manoukian, but the final order was issued by Judge Stoelker.

5

The motion to quash was continued while the parties attempted to negotiate an agreed resolution, which they failed to do, apparently because of differences over how the messages should be produced. Navalimpianti's Florida counsel declared that many of the messages were written in Italian, such that Negro's counsel would have to entrust them to his client for translation. Counsel therefore feared that production to counsel would "effectively result in the delivery of the Google production into the hands of Matteo Negro, not counsel." He felt obligated to oppose such a measure "[g]iven the history of this litigation and the failure of every Negro related party to produce any gmail communications." He therefore requested that the court "order Google to deliver its data production to an independent third party capable of making an accurate copy and of establishing benchmarks for the data, such as measuring the quantity of data, the number of emails, and the number of pages produced. Once the copy is made, the Google data can be delivered to counsel for Negro forthwith for privilege review and production as counsel and Mr. Negro deem expedient."

The motion to quash was finally heard on August 2, 2013. On August 19, the court issued an order denying the petition and directing production of the e-mail messages to SFL Data. In other respects the order substantially reiterated the tentative ruling.

### E. Google Motion to Vacate or Amend

A copy of the August 19 order was transmitted to Google, which filed a motion on September 3, 2013, to either vacate the order or amend it to provide "an alternative procedure that would permit [Google] to *voluntarily* disclose content consistent with the SCA and any order of this Court." Google stated that it could "voluntarily disclose the content of a user's email account to the user or the user's representative when the lawful consent of the user is established through the user's account by sending an email to Google from that account consenting to disclosure." It argued, however, that the SCA

6

"does not provide a mechanism for private parties to compel disclosure of a user's email via a subpoena or court order directed to Google. See 18 U.S.C. §§ 2702(a)(1); (b)(1)-(8)." It challenged the August 19 order's "judicial decree of user consent" when the record showed that Negro had "not consented at all." Google requested that the discovery "apply only to the email address from which it was sent, and permit Google to disclose all reasonably available Gmail communications from that account for the relevant time period. Though Respondent's subpoena only sought emails to and from fourteen individuals identified by name, *see* Fornasero Decl., Ex. A, Google cannot conclusively verify which emails addresses are associated with which persons and should not bear the burden of incorrectly producing an email due to a typographical or other error . . . . The Court and the parties to the litigation are in the best position to determine relevance."

Google's motion included a proposed order directing Negro to send an e-mail from his Gmail account in which he would state that he "expressly consent[ed]" to disclosure of the e-mails to his attorney. The order would recite that Google "agrees to produce the Gmail content designated in the consent e-mail to the party designated in the consent email."

### F. Petition for Writ

On September 16, 2013, Negro initiated this proceeding by filing a petition for writ of mandate or prohibition setting aside the order denying his motion to quash and directing respondent court to enter a new order granting the motion. He also sought a stay of the order.

On October 2, this court ordered a stay of further proceedings on the August 19 order and directed respondent to show cause why the relief sought in the petition should not be granted. As a result of the stay, Google's motion to set aside or vacate the order denying the petition to quash was not heard.

7

## I. Stored Communications Act

The Act states that a provider of an "electronic communication service [ECS] . . . shall not knowingly divulge . . . the contents of a communication while in electronic storage by that service." (18 U.S.C. § 2702(a)(1).) Similarly, a provider of "remote computing service" (RCS) generally "shall not knowingly divulge . . . the contents of any communication which is carried or maintained on that service." (*Id*., § 2702(a)(2).) The scope of protection varies with the service being offered: A message stored in the course of ECS is protected from disclosure only during "electronic storage by that service" (*id*., § 2702(a)(1)), which means "temporary, intermediate storage . . . incidental to . . . electronic transmission" of the message (*id*., § 2510(17)(A)), or "storage of such communication . . . for purposes of backup protection (*id*., § 2510(17)(B)). Communications stored in the course of RCS receive generally broader protection. (*Id*., § 2702(a)(2).)

A provider is excused from these prohibitions when specified users give "lawful consent" to disclosure. (18 U.S.C., § 2702(b)(3).) For either service, consent is effective as to a given communication if given by "the originator or an addressee or intended recipient of such communication." (*Id*., § 2702(b)(3).) In the case of RCS, consent is also effective when given by the "subscriber." (*Ibid*.)

These provisions have generated a great deal of caselaw and commentary concerning the scope of, and limits on, the protections provided by the Act. Here, however, the parties have tacitly assumed that Negro's Gmail messages are covered by the Act's prohibitions, that Negro has the power to consent to their disclosure, and that in the absence of such consent Google would violate the Act by producing the material sought by Navalimpianti.

8

Of course, insofar as any state law requires a person to violate federal law, it is preempted and unenforceable. (See *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 815 ["A state law actually conflicts with federal law 'where it is impossible for a private party to comply with both state and federal requirements' "].) Therefore California's discovery laws cannot be enforced in a way that compels Google to make disclosures violating the Act. The case therefore turns on the question whether Negro has effectively consented to disclosure of the messages here at issue.

## II. Imputed Consent

In its order denying the motion to quash, respondent court made a "find[ing]" that "Negro consents to Google delivering and divulging the contents of his gmail account as described in this Order and pursuant to the Subpoena." The court cited no evidence, and there appears to have been no evidence before it, that Negro had in fact consented to disclosure at that time. Instead the court seemed to *impute* consent to him, apparently concluding that such treatment was warranted by (1) this court's discussion in *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423 (*O'Grady*); (2) Negro's failure to produce the e-mails himself; (3) the Florida court's order authorizing Navalimpianti to subpoena the e-mails; and (4) Negro's control over them. After alluding to these matters, the court wrote, "Because the documents are readily accessible from Google upon Petitioner's consent, those documents are within his control. Therefore, resort to the electronic data bailee is justified. The concept of court ordered consent as an exception to the [SCA] applies here. This consent is sufficient pursuant to 18 USC 2701, et seq."

The "lawful consent" exception to the prohibitions of the Act (18 U.S.C. § 2702(b)(3)) is not satisfied by consent that is merely constructive, implied in law, or otherwise *imputed* to the user by a court. Cases applying the "prior consent" exceptions to the conceptually related anti-wiretapping statute (18 U.S.C. § 2511(c), (d)) have uniformly concluded that while consent under that statute may be "implied," it is not

9

"constructive consent" (*Williams v. Poulos* (1st Cir. 1993) 11 F.3d 271, 281) but must be " ' "consent in fact" ' " (*United States v. Lanoue* (1st Cir.1995) 71 F.3d 966, 981; *Griggs-Ryan v. Smith* (1st Cir.1990) 904 F.2d 112, 116-117; *United States v. Amen* (2d Cir. 1987) 831 F.2d 373, 378; *Walden v. City of Providence* (D.R.I. 2007) 495 F.Supp.2d 245, 262). We can see no reason to posit a less protective standard under the SCA; if anything, as we explain in the following part, the context in which the consent issue is likely to arise in cases like this one militates in favor of a narrower conception of consent, not a broader one.

Nor did anything we said in *O'Grady* contemplate that disclosure of stored messages by a service provider could be obtained on something less than the user's actual consent. On the contrary, we said that where users are also parties to civil litigation, the court has the means to *compel* them to *give* their *actual* consent. Those observations came in response to a contention that the SCA cannot have been intended to categorically foreclose the discovery of e-mail messages in civil litigation. We observed that the Act was "not so restrictive" as this argument portrayed it to be: "Copies may still be sought from the intermediary [i.e., service provider] if the discovery can be brought within one of the statutory exceptions—most obviously, a disclosure with the consent of a party to the communication. (18 U.S.C. § 2702(b)(3).) Where a party to the communication is also a party to the litigation, it would seem within the power of a court to *require his consent* to disclosure on pain of discovery sanctions. [Citations.]" (*O'Grady*, *supra*, 139 Cal.App.4th at p. 1446; italics added.)[2]

---

[2] We had no occasion in *O'Grady*, and have none here, to consider whether there are circumstances in which a *non-party* might be compelled to consent to disclosure. Such a power was posited, or assumed, in *In re Subpoena Duces Tecum to AOL, LLC* (E.D.Va.2008) 550 F.Supp.2d 606, 613, fn. 5 (*AOL*). But the users there—while not parties to the lawsuit in which the discovery was sought—were plaintiffs in a related *qui tam* action. (See *id.* at p. 608.)

10

Nothing in these comments supports what Google has aptly labeled "consent by judicial fiat," in which a court orders a service provider to disclose stored messages based on its own declaration, contrary to fact, that the user has consented to disclosure. Rather we anticipated that a user who is a party to litigation might be ordered to consent "on pain of discovery sanctions," which implicitly contemplates the retention of a power to refuse, and thereby prevent discovery. Of course, such a refusal may be rear, coming as it does at the potential cost in this state—as well as in Florida—of monetary penalties, the adverse adjudication of specific issues, the striking of pleadings, the exclusion of evidence, or dismissal of the offending party's pleading and entry of default. (See Code Civ. Proc., § 2023.030; Fla.R.Civ.P., rule 1.380(b)(2); *Asper v. Maxy Aviation Services, L.C.* (Fla.App. 2005) 915 So.2d 271, 273 [affirming terminating sanction against defendant based on refusal to consent to release of bank records].) But we did not mean to suggest, and did not suggest, that courts can bypass this step and simply declare that users have consented when in fact they have not.

The nearest thing we have found to the approach adopted by respondent court is the contention by the plaintiff in *Suzlon Energy Ltd. v. Microsoft Corp.* (9th Cir. 2011) 671 F.3d 726, that the defendant in an Australian fraud suit had impliedly consented to the disclosure of stored e-mails because he had a duty to produce them under Australian law. (*Id.* at pp. 731.) The Ninth Circuit, understandably, "fail[ed] . . . to see the logic of [this] claim." (*Id.* at p. 730.) Similarly, in *Bower v. Bower* (D. Mass. 2011) 808 F.Supp.2d 348, 350-351, the court rejected a contention that a litigant who had left the country and suffered a default could be found to have consented to disclosure of her stored e-mail.

The order denying the motion to quash cannot be sustained on the basis of constructive consent, consent implied in law, or consent otherwise imputed to Negro.

11

### *III. Implied-in-Fact Consent*

In its preliminary opposition, Navalimpianti argued that the Act empowers courts to find implied consent. We have already rejected the premise that disclosure can be compelled on a theory of consent implied *in law*. A more difficult issue is presented by suggestions in two cases that consent might be implied *in fact* from a user's conduct. (See *Lazette v. Kulmatycki* (N.D.Ohio 2013) 949 F.Supp.2d 748, 757; *Flagg v. City of Detroit* (E.D.Mich 2008) 252 F.R.D. 346, 365.) We question the soundness of such a construction of the Act, at least for purposes of compelling a provider to disclose stored messages.[3] However, we need not finally decide the issue because nothing in this record would support a finding that Negro impliedly consented to the disclosure of his e-mails.

---

[3] In neither of the cases just cited did the court's comments on this point appear necessary to its decision. (See *Lazette v. Kulmatycki*, *supra*, 949 F.Supp.2d at p. 757 [plaintiff's conduct insufficient to establish implied consent]; *Flagg*, *supra*, 252 F.R.D. at p. 365 ["strong case" that city employees had impliedly consented to disclosure of text messages, but compelled production by provider rejected, and production ordered by city itself, on other grounds].) Both are further weakened by their uncritical reliance on decisions applying the "prior consent" exception to the federal anti-wiretapping statute. (See 18 U.S.C. § 2511(c), (d); *Lazette v. Kulmatycki*, *supra*, 949 F.Supp.2d at p. 757, citing *Williams v. Poulos*, *supra*, 11 F.3d 271, 281; *Flagg v. City of Detroit*, *supra*, 252 F.R.D. at p. 365, citing *Griffin v. City of Milwaukee* (7th Cir.1996) 74 F.3d 824, 827; *United States v. Rittweger* (S.D.N.Y.2003) 258 F.Supp.2d 345, 354; and *George v. Carusone* (D.Conn. 1994) 849 F.Supp. 159, 164.) We find this reliance misplaced. The legislative history of the anti-wiretapping act *explicitly contemplates* that consent under that act "may be expressed or implied." (Sen.Rep. No. 90-1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News 2112, 2182.) No comparable suggestion appears in the legislative history of the SCA. (See Sen.Rep. No. 99-541, 2d Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 3555; Off. of Technology Assessment, U.S. Cong., Electronic Surveillance and Civil Liberties (1985).)

Further, the two situations are distinguishable. The prior-consent exception to the wiretapping ban will always arise in the context of adjudicating the legal consequences of *completed past events*. In contrast, the SCA's "lawful consent" exception will commonly arise—as it did here—in the context of determining a service provider's *present obligation* to disclose, or refuse to produce, stored messages. To recognize implied-in-fact consent in such a setting is to create uncertainties that can only be resolved safely,

In the wiretapping context, a finding of implied-in-fact consent requires " 'circumstances indicating that the [party] knowingly agreed to the surveillance.' . . . The circumstances . . . will vary from case to case, but . . . will ordinarily include language or acts which tend to prove (or disprove) that a party knows of, or assents to, encroachments on the routine expectation that conversations are private." (*Griggs-Ryan v. Smith*, *supra*, 904 F.2d 112, 117}, quoting *United States v. Amen*, *supra*, 831 F.2d at p. 378.) The typical case involves the user's continued use of a communication device or system after receiving notice that his or her communications may be intercepted. In the absence of such notice, " '[t]he surrounding circumstances must convincingly show that the party knew about and consented to the interception in spite of the lack of formal notice or deficient formal notice.' " (*Walden v. City of Providence*, *supra*, 495 F.Supp.2d 245, 262, quoting *United States v. Lanoue*, *supra*, 71 F.3d 966, 981; see *William v. Poulos*, *supra*, 11 F.3d 271, 281-282 [employee's consent could not be inferred where he was not told of manner in which calls would be monitored, or that he himself would be monitored]; *Berry v. Funk* (D.C. Cir. 1998) 146 F.3d 1003, 1011 [claim that State Department official impliedly consented to monitoring presented issue of fact, where evidence might establish knowledge of capacity to monitor, but not that party to calls "was told that these specific conversations would be monitored"].)

Here there is no suggestion that Negro sent or received e-mails with the foreknowledge that they might not remain private. In that regard the case resembles *Bower v. Bower*, *supra*, 808 F.Supp.2d 348, 350-351, where the court considered whether

from the provider's perspective, by forcing the court to adjudicate them. But once the court's power is invoked, there is no apparent reason for it not to directly address the issue whether the party-user should simply be ordered to give his or her *express* consent. A rule recognizing implied consent would thus seem destined to magnify litigation—if only by driving the provider into court along with the parties—for little, if any, discernible advantage.

13

a defendant who had not appeared in the action could be found to have impliedly consented to the disclosure of e-mails.  The court found "nothing in [her] actions" from which it could "imply an intent to consent to the disclosure of her information."  (*Id.* at p. 351.)  It distinguished cases where plaintiffs were held to have impliedly consented to disclosure by "affirmative participation in the judicial process."  (*Ibid.*, citing *Thayer v. Chiczewski* (N.D.Ill. 2009) 2009 WL 2957317 at *7 [court "presumed" plaintiff's consent where he had consented to disclosure of some e-mail and had put at issue matters likely to be reflected in stored messages] and *Romano v. Steelcase Inc.* (2010) 30 Misc.3d 426, 428-34 [907 N.Y.S.2d 650, 652-657] [plaintiff ordered to provide executed consent where social website postings might contradict injury claims].)  It also distinguished *Flagg v. City of Detroit*, *supra*, 352 F.R.D. at pages 363-365, as a case involving a "contractual or legal basis" for finding that use of an employer-provided messaging account amounted to consent.  (*Bower v. Bower*, *supra*, 808 F.Supp.2d at p. 351.)

Here as in *Bower v. Bower, supra,* 808 F. Supp.2d 348, there is simply no evidence of conduct by Negro on which a finding of implied-in-fact consent might rest. Since his consent cannot be imputed in law, the trial court had no basis on which to conclude that he had given consent to disclosure.  Its order denying the motion to quash, when made, directed Google to violate federal law, and was thus a manifest abuse of discretion.  That was the state of the record when we issued our order to show cause; and had the record remained in that state, we would have issued a peremptory writ setting aside the order.

## IV. *Effect of Post-Order Developments*

### A. *Background*

After we issued our order to show cause in this matter, Circuit Judge Thornton overruled the magistrate's order in the Florida case and granted Navalimpianti's motion for an order directing Negro to consent to disclosure.  On October 10, 2013, Judge

14

Thornton issued an order directing Negro to send an e-mail to Google stating that he was the user of a specified address and that he consented to disclosure of messages between himself and 14 named persons or entities over a specified range of dates. The order also stated that the e-mails would not be made available to counsel for Navalimpianti until counsel for Negro had reviewed them and prepared a privilege log fairly describing any messages withheld on the basis of privilege or of being outside the scope of discovery. Although the attorneys appeared to agree at the hearing that the order would call for production to a designated third party, the order as issued did not specify to whom the initial production was to be made.

On October 14, Negro sent an e-mail as directed by the court, with a copy of the order attached, but adding the following language: "When you respond with the documents you are to only send them to my attorney, David Feingold" at a specified Gmail address.

On October 21 Negro filed a motion to stay the October 10 order in which his Florida counsel wrote, that "Mr. Negro does not consent to the release of his emails. Mr. Negro did forward the exact email which this Court ordered which stated that there was consent, but said email was compelled to be forwarded by this Court without Mr. Negro's actual consent or approval. Mr. Negro simply forwarded the email out of concern for his punishment for failing to abide this Court's order even though this matter is being appropriately handled by a California court." Counsel asserted that if Google were to make production based on Negro's compelled consent, it would be exposing itself to civil liability and criminal penalties.

On October 23, 2013, Judge Thornton issued an amended order directing Negro to send another e-mail to Google "as stated in this order" and without modifying the text. The order also provided that unless the California court directed otherwise, the e-mails

15

were to be produced to a named Florida magistrate by e-mail, whereupon she would make a copy and forward it to counsel for Negro "for privilege review."

On October 23, 2013, Negro complied with this order, sending an e-mail to Google reiterating his consent to disclose the messages as described.

### B. Sufficiency of Showing

The first question concerning the foregoing post-order developments is whether they have been competently established for purposes of this proceeding. The answer is yes.

When Negro filed his petition in this proceeding, he alleged that the Florida court had not ordered him to consent to the disclosures sought by Navalimpianti. This was true at the time, but in its return Navalimpianti was able to allege that the court had now "twice ordered Negro" to send e-mails from his Gmail account consenting to the requested disclosures, and that he had done so. The texts of the orders and corresponding e-mails are set out at length in the body of the return. Copies of all four documents also appear in the appendix filed by Google. In the accompanying memorandum, Google acknowledges receipt of the e-mails, with attached orders.

In his reply to the returns, Negro does not deny or controvert Navalimpianti's allegations concerning Judge Thornton's post-petition actions. This fact alone permits us to treat those allegations as true. "In mandamus proceedings the answer of the defendant is accepted as true unless controverted by the plaintiff." (*Steiger v. Board of Sup'rs of Los Angeles County* (1956) 143 Cal.App.2d 352, 359; see *Most v. First Nat. Bank of San Diego* (1966) 246 Cal.App.2d 425, 432 ["matters alleged in the return to an alternative writ of mandate which, if true, sufficiently show cause to deny the peremptory writ, are accepted as true unless controverted by the petitioner"]; *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 625, fn. 10 ["Plaintiff's failure to file a replication to the

16

answer requires that all ultimate facts contained therein be accepted as true unless countervailed by proof."].)

Indeed, while Negro's reply brief addresses the legal significance of these events only obliquely, he acknowledges that they occurred. Accordingly, they have been competently established.

### C. Cognizability

Both Negro and Google emphasize that Negro's court-ordered consent only occurred after respondent court had denied the motion to quash. The apparent implication is that these events have no bearing on this matter. A few cases may be understood to support such a view. (See *Hallissy v. Superior Court* (1988) 200 Cal.App.3d 1038, 1042, fn. 2, disapproved on another point in *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 813, fn. 29; *Mahoney v. Superior Court* (1983) 142 Cal.App.3d 937, 940, fn. 2; *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 166, fn. 5.) However the preponderance of authority holds that a court entertaining a proceeding in mandate may consider "all relevant evidence, including facts not existing until after the petition for writ of mandate was filed." (*Bruce v. Gregory* (1967) 65 Cal.2d 666, 670-671; *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1592; see *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 79, fn. 6; *State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 742; *Cooke v. Superior Court* (1989) 213 Cal.App.3d 401, 407, disapproved on another point in *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 106, fn. 30; *McCarthy v. Superior Court* (1987) 191 Cal.App.3d 1023, 1031, fn. 3.) Such consideration is particularly apt where, as here, the effect of the additional evidence may be to *validate* an action *that would otherwise have to be set aside*. (See *McIntosh v. Aubry*, *supra*, 14 Cal.App.4th at p. 1592.)

Here, as we have already concluded, the order denying the petition to quash, when made, constituted a manifest abuse of discretion because it commanded Google to violate

17

the SCA. But if subsequent events have validated it—or more precisely, would sustain substantially the same order now—issuance of a writ setting the order aside would only generate delay and duplication of effort. Further, Google's motion to modify or vacate the order denying the motion to quash remains unresolved. To blind ourselves to facts tending to validate the order under scrutiny would merely sow confusion and further protract this already over-complicated matter.

We will therefore take cognizance of the two e-mails sent by Negro in which he expressed consent, in compliance with Judge Thornton's orders, to the disclosure sought by Navalimpianti. This brings us to what we view as the substantive linchpin of the case: whether these e-mails constitute the "lawful consent" contemplated by the SCA, and if so, whether compulsory process will lie to compel Google to produce the materials sought. The answer to both questions is yes.

## V. *Efficacy of Compelled Consent*

Negro contends that his e-mailed consent to disclosure does not constitute the "lawful consent" contemplated by the Act because it was "judicially coerced." He offers little syllogistic support for this contention; indeed much of his argument is a challenge to the power of *respondent superior court* to coerce his consent. But that is not what happened. The only effort to compel his actual consent came, quite properly, from the court with jurisdiction over the main action. It is the effect of that consent with which we must concern ourselves.

Insofar as Negro's argument bears on this question it consists largely of superficial generalities. His most pertinent assertions are that "consent" generally contemplates "voluntary agreement," a proposition for which he cites a law dictionary which he then paraphrases at some length for additional propositions on the general subject of consent. He rests no particular argument on any particular proposition, but simply offers what

18

amount to a number of definitions, tacitly inviting us to conclude that the consent given here fails to satisfy some or all of them.

Even if more cogently expressed, such an abstract definitional approach would be unsound. "[T]here is no one definition which inevitably attaches to the word consent, and courts which look for *the* meaning of the term are seeking something which does not exist. In several areas of the law the same facts constitute consent for one purpose but not for another. The term refers to a series of complex circumstances—a person knows certain things, has a certain power of choice, comes to a certain conclusion and manifests it in some way. Which of these factors must be present will depend on why consent is significant in the particular legal context at hand." (Note, Consent, Liability and Guilt: A Study in Judicial Method (1955) 7 Stan. L.Rev. 507, 512-513, fns. omitted.)

In other words, what constitutes legally effective "consent" depends on the purposes served by that concept in the setting where the question arises. The SCA's requirement of "lawful consent" is manifestly intended to invest users with the final say regarding disclosure of the contents of their stored messages while limiting the burdens placed on service providers by the Act. (See *O'Grady*, *supra*, 139 Cal.App.3d at pp. 1446-1447.) The latter interest is obviously diminished to the extent that the Act is applied in such a way as to embroil service providers in disputes between users and those seeking discovery over the legal sufficiency of a user's conduct to constitute consent. As relevant here, this consideration militates against requiring a service provider to concern itself with a user's ex post facto claim that his express consent was vitiated by some external cause. If the provider is given satisfactory proof of the user's consent, it should be entitled to rely on it. Once users have consented to disclosure, they should not be able to embroil providers in disputes with discovering parties over the effectiveness of that

19

consent.[4]  They may of course seek appropriate relief if there is a basis on which to conclude that their consent was ineffective.  But they should not be permitted to do what Negro has done here, and threaten to hold a provider liable for disclosures to which they have explicitly consented.  Certainly they should not be able to play two courts off against each other by contending that the "judicial coercion" practiced by one of them deprives the other of the power to enforce an otherwise lawful subpoena.

In any event we emphatically reject Negro's claim that his consent is vitiated by "judicial coercion."  That court-ordered consent would be effective to satisfy the Act was implicit in *O'Grady*, *supra*, 139 Cal.App.4th at page 1446.  At least two courts have actually resorted to such a measure.  (*Romano v. Steelcase, Inc.*, *supra*, 30 Misc.3d 426, 435 [907 N.Y.S.2d 650, 657]; *Al Noaimi v. Zaid* (D. Kan. 2012) 2012 WL 4758048 [ordering plaintiff to execute consent to be attached to subpoena directed to e-mail provider].)  Others have endorsed this approach.  (See *AOL*, *supra*, 550 F.Supp.2d 606, 613, fn. 5 [court in underlying action "could order the Rigsbys to consent to AOL's disclosing the contents of their e-mails under the pain of sanctions"]; *Glazer v. Fireman's Fund Ins. Co.* (S.D.N.Y. 2012) 2012 WL 1197167, at *3 [court "need not determine" whether party's communications were protected under Act because it could "simply *direct* that she consent to disclosure"].)

Nor is coerced consent in such circumstances a novel idea.  As we noted in *O'Grady*, *supra*, 139 Cal.App.4th at page 1446, courts in a variety of other settings have compelled parties to consent to a third party's disclosure of material where such consent

---

[4]  Similar considerations inform our doubt that implied consent—even implied in fact—can constitute the "lawful consent" contemplated by the Act.  (See fn. 3, *ante*.)  If a party serves a subpoena together with a claim that the user *impliedly* consented to disclosure, the provider may have little choice but to go into court to litigate the claim.  A far more straightforward solution—not implicating the provider—is for the discovering party to do what we suggested in *O'Grady*, and what Navalimpianti ultimately did here: secure the user's *express* consent to disclosure.

20

was a prerequisite to its production. (*Ibid*., citing *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 929 [affirming judgment of dismissal after claimant refused to comply with discovery order to sign authorization for release of medical records]; and *Emerson Electric Co. v. Superior Court* (1997) 16 Cal.4th 1101, 1112 [sanctions available against deponent who refuses to comply with order requiring him to perform demonstration or reenactment of accident]; see also *Doe v. United States* (1988) 487 U.S. 201 [order did not violate privilege against self-incrimination where it directed subject of grand jury investigation to consent to disclosure of foreign bank records on pain of contempt]; *In re Grand Jury Proceedings, Yanagihara Grand Jury, Impanelled June 13, 1988* (C.D. Cal. 1989) 709 F.Supp. 192, affirmed, *In re Grand Jury Proceedings* (9th Cir. 1989) 873 F.2d 238 [witness directed to appear before grand jury and sign consent to disclosure of Swiss bank records]; *Ulinsky v. Avignone* (App. Div. 1977) 148 N.J.Super. 250, 251 [372 A.2d 620, 621] [malicious prosecution plaintiff required, on pain of dismissal, to consent to disclosure of expunged records of prosecution]; *Asper v. Maxy Aviation Services, L.C.*, *supra*, 915 So.2d 271, 273 [answer stricken and default entered based on defendant's refusal to consent to release of bank records].)

More broadly, despite the general reluctance of courts to resort to coercive measures (see *Blackburn v. Charnley* (2004) 117 Cal.App.4th 758, 766; *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 726), they will in appropriate cases decree specific performance of a contract and, if necessary, resort to coercion to effectuate the decree, including the application of the contempt power to secure execution of a conveyance or other instrument. (E.g., *Addiego v. Hill* (1971) 17 Cal.App.3d 453, 460 [trial court "properly exercised its powers to adjudge the defendants guilty of contempt in order to carry out the judgment for specific performance" requiring them to transfer stock certificates]; *76 Land & Water Co. v. Superior Court* (1892) 93 Cal. 139, 143 ["the willful refusal of a party to comply with the decree of a court of

competent jurisdiction, directing him to execute a conveyance, constitutes a contempt of such court, and may be punished as such"]; *Burke v. Burke* (Fla.App. 1976) 336 So.2d 1237, 1238, citing Fla.R.Civ.P. 1.570.)  If "judicial coercion" were enough to vitiate the resulting instrument, these powers would be illusory.  We cannot entertain such a dramatic and disruptive departure from existing law without a far more compelling demonstration than Negro has attempted to make.

We have found no decision addressing the claim that the "judicial coercion" manifest in such circumstances deprives the resulting consent of legal effect.  The most nearly analogous situation we have found appears in *Matter of Christian & Potter Aluminum Co.* (9th Cir. 1978) 584 F.2d 326, where 14 appellants challenged a bankruptcy judge's disposition of their claims against a bankrupt corporation on the ground, as relevant here, that they had not effectively consented to summary disposition by the bankruptcy court.  They acknowledged signing a settlement agreement expressing such consent, but they contended that the agreement was the product of duress, in that the court had issued a restraining order prohibiting them from engaging in various transactions with respect to certain disputed property.  The court rejected this contention on multiple grounds, including that "only *unlawful* pressures on a party can constitute duress."[5]  (*Id.* at p. 333.)  "Since the bankruptcy court had jurisdiction to issue the temporary stay while it determined whether or not it had summary jurisdiction over appellants, there was nothing unlawful about the issuance of the restraining order or its effect on appellants' commercial operations.  However coercive its effect, the order did not constitute duress.  Thus, appellants' stipulated consent to the bankruptcy court's

---

[5] In fact many California cases speak of duress not in terms of "unlawful" conduct but rather "wrongful" conduct.  The distinction does not appear significant to the reasoning in that case.  Certainly it is not significant here, since nothing before us fits either characterization.

22

jurisdiction was valid and binding." (*Id.* at p. 334; see *Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 128 ["a threat to take legal action is not unlawful unless the party making the threat knows the falsity of his claim"]; *Marshall v. Packard-Bell Co.* (1951) 106 Cal.App.2d 770, 774 ["it does not constitute duress or coercion to threaten to do that which a party has a legal right to do"].)

The simple fact is that Negro was not deprived of volition in this matter. He was presented with a choice between facilitating the discovery sought by Navalimpianti, or risking such sanctions as the Florida court might elect to impose. He seeks to have the best of both worlds by complying with the court's order while denying that his decision to do so should be given legal effect. We reject this contention and hold that the consent expressly given by him pursuant to court order constituted "lawful consent" under the SCA. (§ 2702(b)(3).)

## VI. *Enforceability of Subpoena*

Google asserts that even when a user expressly consents to disclosure, a civil subpoena is ineffectual to compel them to produce stored content because "[t]he SCA places email content," when sought from a service provider, "outside the scope of civil discovery." In other words, Google construes the Act to confer a blanket exemption or immunity on service providers against compulsory civil discovery process. The Act cannot properly be so construed.

It is true that, as we stated in *O'Grady*, the Act "makes no *exception* for civil discovery." (*O'Grady*, *supra*, 139 Cal.App.4th at p. 1447, italics added; see *Mintz v. Mark Bartelstein & Associates, Inc.* (C.D. Cal. 2012) 885 F.Supp.2d 987, 991 ["The SCA does not contain an exception for civil discovery subpoenas."].) But we did not suggest that it rendered civil discovery process impotent in all circumstances. Rather, we carefully limited our comments to disclosures that were *otherwise prohibited by the Act*, i.e., not within an exception, and particularly to those without the consent of the user.

23

(*O'Grady*, *supra*, 139 Cal.App.4th at p. 1441 ["[a] subpoena is not enforceable *if compliance would violate the SCA*"]; *id.* at p. 1446 ["*Copies may still be sought* from the intermediary *if the discovery can be brought within one of the statutory exceptions*—most obviously, a disclosure with the consent of a party to the communication."] *id.* at p. 1447 ["Congress could reasonably conclude that to permit civil discovery of stored messages from service providers *without the consent of subscribers* would provide an informational windfall to civil litigants at too great a cost to digital media and their users."]; *ibid.* ["Congress could quite reasonably decide" that service provider, as "a kind of data bailee . . . should be legally disabled from disclosing such data in response to a civil subpoena *without the subscriber's consent*"], all italics added.)

Nor do we newly perceive anything in the language of the Act suggesting that Congress intended to grant service providers a blanket immunity from obligations imposed by discovery laws. The Act does not declare civil subpoenas unenforceable; it does not mention them at all. As we have said, it *preempts* state discovery laws insofar as they would otherwise compel a service provider to *violate the Act*. It is this preemption that excuses service providers from complying with process seeking disclosures forbidden by the Act.**6** But nothing in the Act suggests that service providers remain shielded from state discovery laws when the disclosures sought are *not* forbidden by the Act.

In a slight variation on the claim of a blanket exemption, Google contends that the language of the Act makes the consent exception "permissive" and the provider's disclosure under it "voluntary." Thus the Act, in Google's view, "allows, but does not require, disclosure by an electronic communications service provider," so that "Google

---

**6** The similar results reached in federal cases presumably reflect the view that federal discovery laws must likewise give way to the Act under general principles of statutory construction.

24

may not be compelled by an order issued in a civil proceeding to disclose content, even with the user's consent." According to Google, the "text and title of the SCA could not be clearer" on this point. This reading of the Act, however, does not survive scrutiny.

Google relies, first, on the Act's use of the word "may" to frame the exception for disclosure based on a user's consent. (18 U.S.C. § 2702(b).) Perhaps recognizing the slenderness of this reed, Google relies largely on a cited opinion to make the argument. In *In re Facebook, Inc.* (N.D. Cal. 2012) 923 F.Supp.2d 1204, 1206 (*Facebook*), a magistrate judge appeared to adopt the proposition that a service provider is entitled to disregard a subpoena even if user consent has been given.[7] The court declared that "[u]nder the plain language of Section 2702, while consent may *permit* production by a provider, it may not *require* such a production." (*Ibid.*, fn. omitted, italics in original.) This may be literally true as far as it goes; certainly no one before us has suggested that a user's consent, standing alone, obligates a provider to do anything. Neither does 18 U.S.C. section 2702 by its terms impose any affirmative disclosure obligations on the provider.[8] But that observation begs the question that was actually before the court, and

---

[7] The court's remarks on this point may have been dictum. The case arose from an attempt by a deceased user's family members to subpoena her online postings in the hope of casting doubt on suggestions in an English coroner's inquest that her death was self-inflicted. It was apparently undisputed that the user had not consented to disclosure. Now of course she could not do so. In apparent sympathy to the family's position, the service provider suggested that the court make "an order establishing Applicants' authority to tender consent on [their decedent's] behalf and compelling disclosure of [her] Facebook records." (*Facebook, supra,* 923 F.Supp.2d at p. 1205.) The court's reasons for rejecting this apparent invitation are far from clear, but it was apparently in this context that the court propounded the views for which the opinion is cited by Google.

[8] On the other hand, the idea that a consenting user has no right to disclosure seems somewhat at odds with the suggestion in some cases that users can be directly compelled to produce stored communications in a service provider's possession on the rationale that they are within the user's " 'possession, custody, or control' " because "he has 'the legal right to obtain [these] documents on demand' from [the provider]." (*Mintz v. Mark Bartelstein & Associates, Inc., supra,* 885 F.Supp.2d 987, 994, quoting *United*

is now before this court:  not whether consent by itself requires production, or even whether the Act coupled with consent requires production, but whether a *subpoena* can require production when the Act, due to user consent, permits such production.  Insofar as *Facebook* can be understood to address this question, its treatment rests entirely on the premise that " ' "may" . . . usually implies some degree of discretion' " (*Facebook, supra,* 923 F.Supp.2d at p. 1206, fn. 7, quoting *United States v. Rodgers* (1983) 461 U.S. 677, 706), from which the court deduced that the Act vests providers with the power to refuse even those disclosures that would not violate it.

This treatment places much more weight on a very small word than it is designed to bear.  It is certainly true that "may" generally conveys permission, and that when used in contradistinction to "shall" it implies a discretionary power or privilege, as distinguished from a mandatory duty.  (See *Hogya v. Superior Court* (1977) 75 Cal.App.3d 122, 133; *Tarrant Bell Property LLC v. Superior Court* (2011) 51 Cal.4th 538, 542.)  This was exactly the context in which the Supreme Court made the remarks quoted in *Facebook*:  The question was whether a statutorily conferred power to decree a sale was mandatory or discretionary, and in adopting the latter reading the court relied in part on the statute's use of "may" where a predecessor statute had used "shall."  (*United States v. Rodgers*, *supra*, 461 U.S. at p. 706, quoted in *Facebook*, *supra*, 923 F.Supp.2d at p. 1206, fn. 7.)

---

*States v. Int'l Union of Petroleum & Indus. Workers* (9th Cir.1989) 870 F.2d 1450, 1452.) If the provider is entitled *not* to honor such a demand, as Google contends, it would seem to follow that a user cannot be compelled to produce them, but only to ask for them. Google has expressed a willingness to honor such requests, but that hardly bespeaks a " 'legal right' " to obtain them " 'on demand.' "  We have no occasion to resolve this tension, but if it is ultimately resolved in favor of Google's interpretation it will make compulsory process, such as the instant subpoena, the *only* way to ensure production of stored messages in civil litigation.

This approach simply does not work in the present context, where the "may" in question is juxtaposed not with a "shall"—real or hypothesized—but with an earlier "shall not"—specifically, the Act's declaration that a service provider "shall not" knowingly disclose protected materials. (18 U.S.C. § 2702(a).) The subdivision where "may" appears is framed not as a grant of discretionary power *or* as the imposition of a mandatory duty but as a special *exception* to a general *prohibition*. In such a context all "may" means is that the actor is excused from the duty, liability, or disability otherwise imposed by the prohibition. Stating that the actor "may" engage in the otherwise proscribed conduct is a natural way—indeed the most natural way—to express such an exception. Thus a traffic law might declare that a driver *shall not* proceed against a red light, but *may* proceed, under stated conditions, to make a right turn. This means only that when the stated conditions are present, the driver is relieved of the obligation to wait for a green light. It does not exempt the driver from duties arising under other laws, such as not to obstruct traffic, or to get out of the way of emergency vehicles. The use of "may" in such a context can connote that the actor is not *obliged* in all cases to perform the contemplated action; but it has no tendency, by itself, to excuse the actor from obligations or liabilities arising from other sources.

Another federal magistrate judge has observed that "there should be a clear expression of congressional intent before relevant information essential to the fair resolution of a lawsuit will be deemed absolutely and categorically exempt from discovery and not subject to the powers of the court under Rule 26." (*ICG Communications, Inc. v. Allegiance Telecom* (N.D. Cal. 2002) 211 F.R.D. 610, 614; fn. omitted.) Congress's use of the word "may" to frame an exception to the Act's general prohibition on disclosure is not such a "clear expression of . . . intent" as will justify a reading of the Act that categorically immunizes service providers against compulsory

27

civil process where the disclosure sought is excepted on other grounds from the protections afforded by the Act.

Google also cites the Act's headings as evidence that disclosure under the consent exception is "voluntary." As codified, the section containing the consent exception is entitled "Voluntary disclosure of customer communications or records" (18 U.S.C. § 2702), while the section following it—which provides for disclosure at the behest of various government actors—is entitled "Required disclosure of customer communications or records" (*Id.*, § 2703). We can attach no significance to these headings, for they are the creatures not of Congress, but of the codifiers. In the Act as adopted, the heading for 18 U.S.C. section 2702 was "Disclosure of contents," and the heading for 18 U.S.C. section 2703 was "Requirements for governmental access." (Pub. Law 99-508, 1986 HR 4952, as approved Oct. 21, 1986.) Statutory headings are rarely given much weight to begin with, but a heading is not evidence of congressional intent if it "was not part of the statute as passed by Congress . . . , but was added subsequent to enactment by those responsible for codification of the legislation." (*United States v. Castro* (11th Cir. 1988) 837 F.2d 441, 442, fn. 1.)

Even if the codifiers' headings were evidence of congressional intent, they would provide little guidance here. The codifiers apparently used the term "voluntary" in the heading to 18 U.S.C. section 2702 for two purposes. One was to convey the sense that an *in*voluntary disclosure will not subject a provider to liability under the Act. This intent is more narrowly expressed in the text, which only prohibits service providers from "knowingly" divulging protected information. (*Id.*, § 2702(a).) The second function of "voluntary" is to capture a perceived difference in the intended effect of the Act as between disclosures under 18 U.S.C. section 2702(b), including those based on user consent, and disclosures under 18 U.S.C. section 2703. The codifiers apparently concluded that the Act did not obligate a provider to make disclosure authorized by the

28

former section, but *did* obligate them to make disclosures authorized by the latter. We have no occasion to study the matter further, for as we have already said, Congress's intent to limit the new, additional obligations the Act imposed on service providers does not translate into an intent to immunize them from obligations arising under other laws.

A seemingly contrary reading may be attributed to a case relied upon by Google, in which the court described other cases as "quash[ing] . . . subpoenas on the basis that "the SCA *forbids* an e-mail provider from producing its customers' personal e-mails in a civil case." (*Special Markets Ins. Consultants, Inc. v. Lynch* (N.D.Ill. 2012) 2012 WL 1565348, at p. *2; italics added.) We concur in this statement if it is understood to refer only to disclosures *not otherwise excepted* from the Act's prohibitions. But where a disclosure falls within an exception, nothing in the Act forbids it; on the contrary, by virtue of the exception, the Act permits it. None of the four cases cited by the court supports the broad rule attributed to them. In two of them, as in the citing case itself, no exception to the Act's prohibitions had been invoked by the discovering party; nor do any of these three cases mention user consent. (See *ibid*.; *J. T. Shannon Lumber Co.* (N.D.Miss. 2008) 2008 U.S. Dist. LEXIS 104966; *Chasten v. Franklin* (N.D. Cal. 2010) 2010 WL 4065606, *2.) We have already mentioned the other two cases. In *AOL*, *supra*, 550 F.Supp.2d 606, 613, footnote 5, the court upheld a magistrate's refusal to enforce a subpoena, but observed that another court could "order the [users] to consent to AOL's disclosing the contents of their e-mails under the pain of sanctions." And in *Bower v. Bower*, *supra*, 808 F.Supp.2d 348, 350-351, the court declined to rule that an absent party could be "deemed" to have consented to disclosure, but went on to recognize that under a different procedure she might be ordered to do so and subjected to sanctions if she refused.

In sum, we find no sound basis for the proposition that the Act empowers service providers to defy civil subpoenas seeking discovery of materials that are excepted from

the Act's prohibitions on disclosure. Insofar as the Act permits a given disclosure, it permits a court to compel that disclosure under state law. It follows that when a user has expressly consented to disclosure, the Act does not prevent enforcement of a subpoena seeking materials in conformity with the consent given.

## VII. Modifications to Order

We conclude that although there was insufficient basis to compel Google's compliance with the subpoena at the time the court denied the motion to quash, subsequent events have taken the contemplated disclosures outside the SCA and will indeed permit the subpoena to be enforced. However, the production can go no farther than the consent Negro has given. This fact will necessitate some modifications to the order under scrutiny. Additional modifications are warranted in light of Google's representations concerning its own capabilities and limitations. We also believe certain technical modifications are advisable to simplify future issues of authentication and chain of custody.

In addition, Negro has raised various other objections to this discovery at various times. The order denying his motion to quash declared that "[n]o objections other than privilege" were to be asserted, and directed counsel for Negro to produce "any Data that are not claimed to be privileged." We find this provision troubling in two respects. First it appears to suppose that Negro has forfeited all other objections. That may well be a sound conclusion, but it would seem to require more explanation than appears in the order under review. Second, Google has stated that it is unable to filter e-mails based on the names of Negro's correspondents—which is the only limitation on content set forth in the subpoena. It must therefore apparently produce all messages within a specified range of dates. This raises the likelihood that the materials produced will include messages from persons unknown, not named in the subpoena and quite possibly having no connection whatever with the present controversy. At a minimum, then, the materials

30

produced by Google must be filtered after production to eliminate correspondents not named in the subpoena.  Because such matters can almost certainly be better administered in the court hosting the underlying litigation, we have adopted the approach of Judge Thompson's last order and directed that production be made to the magistrate in the Florida court.

Accordingly, unless the parties agree otherwise, or intervening circumstances compellingly warrant additional modifications, the motion to quash should be denied in substantially the following form:  "Petitioner's motion to quash the subpoena directed to Google, Inc., is denied.  In accordance with petitioner's consent to disclosure as expressed in e-mails dated October 14 and 23, 2013, Google is directed to produce, within 15 days from the date of this order, all messages bearing dates between May 31, 2009 and July 1, 2010 from the account specified in those e-mails.  Google is directed to copy the messages to one or more CDs or DVDs.  Google is further directed to mail the disk or disks thus prepared to Magistrate Judge Elizabeth Schwabedissen at an address to be furnished by counsel for Navalimpianti.  Google will promptly notify counsel for Navalimpianti when the disk is mailed, and counsel will notify counsel for Negro."

### DISPOSITION

Let a peremptory writ issue directing respondent court to set aside its order of August 19, 2013, and issue a new order in accordance with part VII of this opinion.

31

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
MÁRQUEZ, J.

32

Trial Court:                                          Santa Clara County Superior Court
                                                      Court No.:  CV239634

Trial Judge:                                          The Honorable
      James L. Stoelker


Attorneys for Petitioner                              Adleson, Hess & Kelly
Matteo Negro:
                                                      Jeffrey A. Baruh
                                                      Joanne M. Wendell


Attorneys for Real Party in Interest                 Idell & Seitel
Navalimpianti USA, Inc.:
                                                      Richard J. Idell
                                                      Ory B. Sandel

                                                      Gunster, Yoakley & Stewart

                                                      Joseph L. Raia


Attorneys for Real Parties in Interest               Perkins Coie
Google, Inc.:
                                                      Timothy L. Alger
                                                      Kevan Fornasero

33